1         UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
2              JACKSONVILLE DIVISION

3    SILVERADO CAPITAL, LLC,        Jacksonville, Florida

4         Plaintiff,               Case No. 3:23-cv-556-MMH-PDB

5    -vs-                          June 3, 2024

6    WATER STREET CAPITAL, INC.,   9:58 a.m. - 11:24 a.m.

7         Defendant.               Courtroom 5B
     _____

8

9

10            **DIGITALLY RECORDED MOTION HEARING**
          BEFORE THE HONORABLE PATRICIA D. BARKSDALE
11               UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20   OFFICIAL COURT REPORTER:

21     Katharine M. Healey, RMR, CRR, FPR-C
       PO Box 56814
22     Jacksonville, FL  32241
       (904) 301-6843
23     katharinehealey@gmail.com

24
                      (Proceedings reported by stenography;
25                   transcript produced by computer.)

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | COUNSEL FOR PLAINTIFF: |
| 3 | **LAUREN V. PURDY, ESQUIRE**<br>**DAVID M. WELLS, ESQUIRE** |
| 4 | **JUSTIN DELISE, ESQUIRE**<br>Gunster, Yoakley & Stewart, P.A. |
| 5 | One Independent Drive, Suite 2300<br>Jacksonville, FL 32202 |
| 6 | (904) 350-7167<br>lpurdy@gunster.com |
| 7 | dwells@gunster.com<br>Jdelise@gunster.com |
| 8 | |
| 9 | |
| 10 | COUNSEL FOR DEFENDANT: |
| 11 | **RICHARD D. RIVERA, ESQUIRE**<br>**STEVEN E. BRUST, ESQUIRE** |
| 12 | Smith, Gambrell & Russell, LLP<br>50 North Laura Street, Suite 2600 |
| 13 | Jacksonville, FL 32202<br>(904) 598-6157 |
| 14 | rrivera@sgrlaw.com<br>sbrust@sgrlaw.com |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1                        P R O C E E D I N G S
2    June 3, 2024                                    9:58 a.m.
3                              - - -
4              COURT SECURITY OFFICER:  -- Middle District of
5    Florida is now in session.  The Honorable Patricia D. Barksdale
6    presiding.
7              Please be seated.
8              THE COURT:  Good morning.  We're on record in
9    *Silverado Capital vs. Water Street Capital.*  It's 3:23-cv-556.
10             I'll have counsel introduce themselves for the
11   record, starting with Ms. Purdy.
12             MS. PURDY:  Good morning, Your Honor.
13             THE COURT:  Yes.
14             MS. PURDY:  Lauren Purdy --
15             THE COURT:  I'm trying to teach my law students the
16   rules of courtroom decorum, which require you stand.
17             Okay.
18             MS. PURDY:  Good morning, Judge Barksdale.  Lauren
19   Purdy with the Gunster law firm on behalf of Silverado Capital.
20   With me is associate Justin Delise from my office, and my law
21   partner, David Wells.
22             THE COURT:  All right.  Good morning.
23             MR. WELLS:  Good morning, Your Honor.
24             THE COURT:  Good morning.
25             We also have counsel for the defendant.

1          MR. RIVERA:  Good morning, Your Honor.  Richard
2   Rivera of Smith, Gambrell & Russell for the defendant.  And
3   with me is my partner, Steve Brust.
4          THE COURT:  All right.  Good morning.
5          We're here on your motion.  Mr. Rivera, did you draft
6   the reply?
7          MR. RIVERA:  Yes, Your Honor.
8          THE COURT:  All right.  So what did my endorsed order
9   say?  Do you remember?  I'm going to read it to you.  It's --
10      (Simultaneous speaking.)
11          MR. RIVERA:  -- specifically the issue of whether
12   everything had been produced to us.
13          THE COURT:  And I appreciate that.  It also said the
14   reply must not exceed five pages, inclusive of all parts.  What
15   does that mean to you?  I like to be clear in the way I write
16   things.  What does that mean to you?
17          MR. RIVERA:  Yes, Your Honor.  To me that -- that
18   indicates that the arguments section of the brief -- meaning
19   introduction through the conclusion -- must not exceed five
20   pages.
21          THE COURT:  So what did "parts" -- "all parts" mean
22   to you?  That doesn't include other parts?
23          MR. RIVERA:  Your Honor, that did not, to me, include
24   a cover page or the signature block or certificate of service.
25          THE COURT:  What are those?  What are those called?

1  Why wouldn't that include those parts?

2          MR. RIVERA:  Your Honor, because those are generally

3  excluded from -- from the page count.

4          THE COURT:  No.  So our Local Rules use that

5  language, "all parts."  That means everything.  That means

6  all -- that means all parts, okay.

7          It looked like to me that you ignored that direction

8  and you shrunk the margins in order to get as much as possible

9  in here.

10          I set a five-page limit because there's a lot of

11  paper in this case already.  I didn't want to read more than

12  five pages, inclusive of all parts, and instead I got eight

13  pages and shrunken margins, so more than what I wanted.

14          MR. RIVERA:  My apology, Your Honor.  I obviously --

15          THE COURT:  Did you shrink the margins on purpose?

16          MR. RIVERA:  No, Your Honor.  This is the first I'm

17  hearing that there's shrunken margins on --

18          THE COURT:  In order to fit in the five pages?

19          MR. RIVERA:  No, Your Honor.

20          THE COURT:  All right.  And you know you don't even

21  need a certificate of service, but you added that, and that

22  added a page to it.

23          MR. RIVERA:  Yes, Your Honor, I'm aware that there's

24  no certificate of service needed in --

25          THE COURT:  All right.  So next time, both for an

1    endorsed order or a regular order under the Local Rules, "all

2    parts" actually means all parts.  That's the heading, the

3    signature block, the certificate of service, which you don't

4    need.

5            And there's requirements for typography.  You've got

6    to have certain margins.  You can't play with them in order to

7    get more substance in there.

8            Does that make sense?

9            MR. RIVERA:  Absolutely, Your Honor.  And --

10           THE COURT:  All right.  The reply will be struck

11   because it didn't comply.  And I'll hear your argument on the

12   motion.

13           MR. RIVERA:  Thank you, Your Honor.  Would you care

14   for me to take the lectern?

15           THE COURT:  Please.

16           MR. RIVERA:  May it please the Court.

17           THE COURT:  Yes.

18           MR. RIVERA:  Thank you, Your Honor.

19           Before I get into the substance of the motion, I

20   would like to address one thing with the Court.

21           It has come to our attention during the meetings with

22   opposing counsel that there is a reading of the now-struck

23   reply that implies or could imply that our firm or our client

24   is making allegations against Ms. Purdy and her firm as far as

25   some sort of participation in the alleged forgery and fraud on

1   the Court as is raised in our answer.

2         I just want to be perfectly clear that no such

3   inference was meant or --

4         THE COURT:  I didn't -- I didn't draw that

5   inference --

6         MR. RIVERA:  Okay.

7         THE COURT:  -- no.

8         MR. RIVERA:  Well --

9         THE COURT:  I understand your allegations are against

10  the person --

11        MR. RIVERA:  Yes, Your Honor.

12        THE COURT:  -- not the lawyer.

13        MR. RIVERA:  Yes.  I just wanted to be clear with the

14  Court and -- especially because I told Ms. Purdy that I would

15  do so.

16        THE COURT:  Okay.

17        MR. RIVERA:  But continuing on to the merits of the

18  motion, Your Honor, what this motion and the legal standard for

19  this motion essentially come down to is, well, like all

20  discovery motions, proportionality, but also fundamental

21  fairness.

22        Specifically, when we're talking about the forensic

23  image of a cell phone or a computer, there's a balancing test

24  that the courts apply, and that is whether the importance and

25  the utility of this method of discovery outweighs the privacy

1    concerns for the individual or company whose device is being so

2    imaged and shared.

3          As I'll explain to Your Honor, the importance here

4    far outweighs any potential concerns, which are also further

5    mollified by the fact that we have a confidentiality agreement

6    in place between the parties in this case, which even provides

7    for an attorneys's-eyes-only designation.

8          And as far as a burden of cost, that's not really

9    relevant here, where the native image has already been created

10   in the normal course of --

11         THE COURT:  And that's in the hands of their expert?

12         MR. RIVERA:  That's correct, Your Honor.  I believe

13   they may also have a native image outside the hands of their

14   expert, but that it has been provided to their disclosed

15   expert, Mr. Weil.

16         THE COURT:  And you want it of the iPhone?  Any other

17   kind of electronic device or just the iPhone?

18         MR. RIVERA:  Well, Your Honor, the iPhone is the only

19   device that is the subject of this motion.

20         However, we have also made a request after we

21   received the response and the disclosure of Mr. Weil seeking,

22   essentially, the laptop forensic image that was also produced

23   and provided to him for the purposes of his report.  Silverado

24   has objected to providing that.

25         I imagine however Your Honor rules today about the

1   lap- -- about the cell phone may influence any meetings and

2   conferences that we have regarding that objection.

3         THE COURT:  So it's the same issue:  you want the

4   same information from the laptop?

5         MR. RIVERA:  That is correct, Your Honor.

6         THE COURT:  Okay.

7         MR. RIVERA:  So where I'd like to start is:  Why is

8   this important?

9         This is important because what we have is an alleged

10   oral contract between Silverado and Water Street Capital that

11   occurred in October of 2020.

12         I will say, and it's no secret from the pleadings,

13   Water Street vehemently denies that it entered into an oral

14   contract to pay 10 percent of profits to Silverado.  Silverado,

15   through its principal, Jeff Enquist, vehemently says that, "We

16   absolutely did enter into that; I wouldn't have moved forward

17   had we not."

18         There's a -- there is a meeting that took place in

19   October 2020 between Mr. Enquist on his side and three

20   witnesses on Water Street's side:  Ian Black, Gilchrist Berg,

21   and Davis Berg.

22         All three of our witnesses are going to testify that,

23   "No, there was never such confirmation of this 10 percent

24   agreement," while Mr. Enquist will testify, "Yes, it was

25   absolutely discussed and agreed to."

1          So what we have, really, is a he-said/they-said
2     situation.
3          And what Mr. Enquist has done in his complaint is
4     he's filed this screenshot of a five-month-later exchange
5     between him and one of the persons present at that meeting,
6     Davis Berg, the son of the owner, of Gilchrist Berg, and that
7     purportedly confirms the terms of this agreement.
8          Mr. Berg, again, and -- sorry, Davis Berg, the person
9     on that exchange -- purportedly on that exchange denies, one,
10    that he ever said that, that that was an exchange that is true
11    and accurate; and two, that the words that were used in those
12    exchanges are words that he uses in the normal course of
13    discussing business.
14         And so Mr. Enquist has offered this screenshot of the
15    Signal messages in a way to buttress or to try to overcome that
16    there are going to be three witnesses to his one testifying as
17    to what transpired during that Zoom meeting.
18         I'd like to tell Your Honor a little bit about the
19    Signal messages platform as it relates here.  It is a secure,
20    encrypted -- double-encryption platform where the owner,
21    Signal, doesn't even have access to what's being sent on there.
22         iMessage also kind of works in the same way.  The key
23    difference is with Signal, it has settings whereby a user can
24    set a time limit from after a message is viewed by the
25    correspondent until the time that it is automatically deleted

1    from both devices.

2              And so what we have here is at the time of these

3    messages, March 2021, Mr. Enquist had set the time for the

4    deletion of these messages to seven days, one week.

5              When we first sought the native versions of these

6    messages in discovery, which we requested in June of 2023 and

7    received in November of 2023, the metadata associated with

8    these messages reflected that they were created 14 months after

9    the conversation in question.  This raised our hackles quite a

10   bit because under the Signal platform it was an impossibility

11   that the screenshots could have been taken at that time.

12             And I know that the -- the course of the discovery

13   discussions are set forth in both the motion and the response

14   here, so I won't detail too much into that.  But eventually,

15   after we filed our motion to compel, we were provided with

16   native images taken from Mr. Enquist's laptop, which had a --

17   what I will call a consistent creation date, meaning that they

18   could have been created during the time that the messages

19   persisted on the Signal app before they were automatically

20   deleted.

21             We've sent a subpoena to Signal to try to get any

22   information or any metadata, anything relating to the messages

23   between Mr. Enquist and Mr. Davis Berg.  We received a response

24   to that subpoena saying Signal doesn't have any of that.  They

25   can't tell us the dates or times that messages were sent.

1  They've insulated themselves, really, to make this a secure app

2  that they can't even participate with law enforcement when

3  compelled to do so.

4          And so, Your Honor, the timeline has been very

5  extenuated on this.  When we're talking about messages that are

6  purportedly created in March of 2022, we don't see any sort of

7  copy of those until the filing of the complaint in this matter,

8  when they're attached as exhibits.

9          Immediately after the 26(f) conference we're seeking

10  the native images because we understand that the metadata is

11  going to be very important in this case.  And it's not until

12  nearly ten months later that we're receiving anything that has

13  metadata that is, let's just say, again, consistent with the

14  original screen captures being taken while the messages

15  persisted.

16          And then as we're talking about the importance and

17  fairness here, I will call Your Honor's attention specifically

18  to the opening expert report of Michael C. Weil.  I believe we

19  just had the first couple of pages filed as an exhibit to our

20  motion.  And on the second page he attests:

21          "In forming my opinions set forth in this report, I,

22  or staff working at my direction, have reviewed and analyzed

23  the following materials:

24          "Forensic mobile phone collection named 'UFED Apple

25  A2341 MGLW3LL A iPhone 12 Pro 2023 09 18 (1)' of Jeffrey

1 Enquist's Apple iPhone Pro," with a serial number, that was

2 created on September 18th, 2023, by this eDiscovery vendor

3 Cimplifi.

4         We also have essentially the same statement made

5 about the forensic image of Mr. Enquist's laptop, and

6 specifically that he had direct access to Jeffrey Enquist's

7 physical mobile device.

8         We're not seeking the actual mobile device.  Frankly,

9 we don't think that as it exists in its current state is as

10 relevant as when it existed when it was collected and imaged by

11 Cimplifi in September of 2023.

12         And why are we doing that?  Well, because what we

13 have are screenshots of these Signal messages.  What we do not

14 have are the actual Signal messages themselves, which would

15 contain a lot of metadata that's not captured in the

16 screenshots.

17         For example -- and I assume Your Honor has not used

18 the Signal platform, but if you go onto a particular message,

19 you can kind of swipe it and you'll see when it was sent, when

20 it was received, what time it will delete, and the recipient or

21 sender of the message.

22         And why that's important, one, is because, as was

23 attached to the reply brief but I will represent here to Your

24 Honor, it's possible to create an image of a -- a photo --

25 excuse me, a screen cap of a Signal message purporting to show

1   communications with another person in myriad ways.  One of them

2   is by -- as Your Honor may understand the term -- Photoshop;

3   actually taking one image, changing the content of it through

4   using Photoshop or another image, a manipulation program, and

5   then taking a screenshot of the -- of the product.

6          In Mr. Weil's report he says that "if I had received

7   an image that was itself Photoshopped, there would be metadata

8   reflecting that."

9          But there wouldn't be metadata reflecting that if it

10  is a screenshot of the manipulated message.  There also

11  wouldn't be an indication, what we've received already, that

12  this wasn't created using -- some might call it a burner, but

13  just a second telephone whereby you can change -- just in your

14  telephone, change the contact information for a contact and

15  make it appear that someone else is texting you or sending you

16  Signal messages.

17         For example, in a declaration attached to the reply,

18  I, along with an associate at my firm, Cassie Daum, in about

19  five minutes created a screenshot of a message purporting to be

20  from Jeff Enquist saying he made the whole thing up, sorry if

21  this has caused you in trouble.

22         And then we had a contemporaneous screenshot of the

23  contact information for Jeff Enquist that didn't show his

24  actual telephone number but did have the telephone number of

25  his counsel that are sitting here, just showing how clearly and

1    easily this can be manipulated.

2           So what we're looking for, really, is to have the

3    same access that their expert had to the files that were handed

4    over and not have a curated experience of what was on his

5    cellular telephone on September 2023.  And that is to be able

6    to look at the creation date of other image files that are on

7    there in and around and in between the time where we're looking

8    at the date that this message was purportedly exchanged and

9    when we have the original metadata reflecting this May 2022

10   creation date, 14 months after the exchange -- I'm sorry,

11   May -- yes, May 2022.  I wanted to make sure I had my date

12   correct there.

13          We're also looking for changes in contact

14   information.  And I do think it's -- it's notable that Mr. Weil

15   says that he looked at the phone as it exists today to see the

16   contact information, well, the day of his report rather than

17   the date -- or looking at the contact information that would be

18   reflected on the native forensic image itself, and looking for

19   other files created, potentially, by a Photoshop or other

20   manipulation program.

21          And notably, there's also programs that can change

22   the metadata itself on a file.  Even if Your Honor were to open

23   your iPhone, or Android, there's a way to edit metadata

24   directly into an image.  Now, that does -- that way does leave

25   telltale signs.  There's an original and a modified date.  But

 1    there are other programs that don't do that.

 2          And so that's what we're seeking and that's the

 3    importance of it.

 4          As far as the burden goes, as I've said, Your Honor,

 5    there --

 6          THE COURT:  It doesn't seem like there's any burden,

 7    right?  It's already been imaged.

 8          MR. RIVERA:  It's already been imaged --

 9          THE COURT:  All right.

10          MR. RIVERA:  -- that's correct, Your Honor.  And

11    we -- we have a confidentiality agreement in place.  We've also

12    submitted procedures that have been approved by other courts in

13    the district and in the Southern District to protect any

14    privacy or privilege concerns that there might be with regard

15    to it.

16          THE COURT:  All right.  Thank you.

17          MR. RIVERA:  Thank you, Your Honor.

18          THE COURT:  Ms. Purdy.

19          Ms. Purdy, do you want to use these screenshots as

20    part of your case?

21          MS. PURDY:  Yes.

22          THE COURT:  Do you want to redo your expert report

23    and have him not use any of the image at all and just use the

24    screenshots to do his report?

25          MS. PURDY:  No, Your Honor.

```
 1          THE COURT:  All right.  Well, they have a really
 2   strong argument.  I can't imagine letting your expert have
 3   everything he does have -- it's a he, right? -- and then giving
 4   them only portions of what he had considering that this is a
 5   substantial issue in the case.  Did your client make these up
 6   or did he not is an issue in the case.  And how on earth can
 7   they defend that without the information your own expert has?
 8          MS. PURDY:  So, Judge Barksdale, I think there's a
 9   few things to start to correct some misunderstandings, maybe,
10   that counsel still has and then to explain what Mr. Weil had
11   access to --
12          THE COURT:  Okay.
13          MS. PURDY:  -- and what he's reviewed.
14          THE COURT:  Before you do that, your primary issue is
15   with privacy?  Relevancy?  Proportionality?  Burden?  What's
16   your primary issue?  Why won't you just give them the image?
17          MS. PURDY:  I would say it's privacy because of
18   multiple points in the way that they're proposing and what
19   they've actually proposed before standing up at this lectern
20   today.
21          So first, I --
22          THE COURT:  Privacy in what way?  It's his own --
23   he's worried about irrelevant stuff on the iPhone?  He wants to
24   keep that private?
25          MS. PURDY:  Yes.
```

1       THE COURT:  Is that it?

2       MS. PURDY:  So, Judge Barksdale, there's a couple

3   things.

4       First of all, before they got up to the lectern

5   today, many of the things that Mr. Rivera said that they would

6   like to have access to they have never raised with us at any

7   point in time.

8       We would concede, certainly, if there was a

9   thoughtful dialogue about specific things that they want to

10  have access to that they need to corroborate this brand-new

11  burner phone theory that we heard about for the first time --

12      THE COURT:  Well, he wants the same image your expert

13  has.  You've known that all along, right?

14      MS. PURDY:  So no, not exactly.

15      THE COURT:  Well, it's in the motion.

16      MS. PURDY:  Yes.

17      THE COURT:  So you do know that

18      MS. PURDY:  Yes, but, Judge Barksdale, our expert

19  didn't -- we didn't just hand over the forensic image of the

20  iPhone and he just poked around wherever he wanted.  We would

21  be getting a different argument from their expert if we said,

22  "All right, Mr. Weil, we're only going to give you these 16

23  images."

24      What we did was we gave him access to the container,

25  right, the forensic image of the iPhone, and he, in the

1   interest of having the best, most direct access to the

2   evidence, the forensic evidence, forensically extracted the

3   images on which he relied for his expert report.

4           And then the other point that I think is really

5   important to clarify, Mr. Weil has never had access to the

6   entire forensic image of Mr. Enquist's laptop.  He received a

7   targeted collection of the Signal messages found on the laptop

8   directly, which we gave them in connection -- in discovery and

9   upon learning, as you saw from our motion, that there was a

10  mistake that our vendor identified in what was produced and

11  which versions of each things were produced.

12          So they actually have literally exactly what Mr. Weil

13  has with respect to the laptop and the forensic collection from

14  the laptop.

15          With respect to the iPhone, Mr. Weil extracted from

16  the iPhone the images on which he relied.  But we didn't just

17  say, "Here's the iPhone.  Poke around and do whatever you

18  like."

19          He went and extracted -- he said, "This is what I

20  need to prove that all he did" --

21          THE COURT:  He had -- he had the image of the iPhone?

22  Your expert had that?

23          MS. PURDY:  Yes, but only for the purposes of --

24          THE COURT:  But he had the entire image of the cell

25  phone and then he decides what on that cell phone he needs to

1    take away, right --

2            MS. PURDY:  Yes.

3            THE COURT:  -- in order to prepare his report?

4            MS. PURDY:  Yes.

5            THE COURT:  Okay.  But you don't want them to have

6    the same thing?

7            MS. PURDY:  Judge Barksdale, they were given the

8    Signal messages on which Mr. Weil relied in response --

9            THE COURT:  They were given images of the Signal

10   messages?

11           MS. PURDY:  Yes, the screenshots --

12           THE COURT:  They were given screenshots?

13           MS. PURDY:  Yes.

14           THE COURT:  Originally without any metadata?

15           MS. PURDY:  No.  They were given the screenshots in

16   three different formats, because they asked for every format.

17           So they got a collection from the iPhone, a self

18   collection that was before -- that actually occurred before the

19   lawsuit was filed, and a collection that was done from a

20   forensic targeting of the laptop.  So they got three.  Some of

21   those messages did not maintain their metadata, but the ones on

22   which Mr. Weil relied on maintained their original metadata

23   from when they were created.

24           The other point that I think is really critical here,

25   Judge Barksdale, is Mr. Rivera said, "We went to Signal, and we

1  subpoenaed them and said 'we need information from you' to do

2  something less invasive."

3        We learned on Friday in this lawsuit that Water

4  Street has not forensically imaged any witnesses's iPhones,

5  including Davis Berg.  So they haven't even checked their own

6  client's iPhone for images.  They have not checked their own

7  client's iPhone for the Signal messages.

8        THE COURT:  Well, yeah, but that's not the point.

9  The -- Signal would have deleted it, right?  If it was set up

10  to delete after seven days, they could search all they want,

11  they won't find it on their cell phones.  Correct or not

12  correct?

13        MS. PURDY:  Yes, except some of the messages that

14  were exchanged between the parties were exchanged before it was

15  set to auto delete, and they say they don't have those either.

16        THE COURT:  Okay.  They're not the messages we're

17  talking about, or they are?

18        MS. PURDY:  I mean, they're part of the whole series

19  of messages in the case, but they're not the ones that are

20  attached to the complaint, that's correct.

21        THE COURT:  All right.  So what good -- what you just

22  said, they haven't even searched their own, what good would

23  that searching have done with respect to the images we're

24  talking about?

25        MS. PURDY:  What it would do is this new theory that

1  we heard about with the reply, that, "Well, we can't show that

2  there's any Photoshops in the Signal messages that you've given

3  us, so now our theory is" --

4         THE COURT:  Or "photos of the Signal messages you've

5  given us," right?

6         MS. PURDY:  Yes.  That there was a burner phone, and

7  maybe he used a burner phone to send himself messages and then

8  he screenshotted those and those are what those messages are.

9         Well, one thing that does maintain in the Signal app,

10  Judge Barksdale, is your entire history.  Even if the messages

11  aren't still there, you have your entire uninterrupted history

12  of Signal communications in that when there's a phone call,

13  when the auto delete gets changed, you can't pull back the

14  messages anymore, but you can see the uninterrupted stream of

15  communications between the parties.

16         THE COURT:  Okay.

17         MS. PURDY:  We think that that's also relevant

18  circumstantial evidence relating to whether or not -- that's

19  something that is relevant to the authenticity of the messages

20  that they haven't checked, but --

21         THE COURT:  Sure, that's relevant, but that's not the

22  end of the story.  That's just a small piece of circumstantial

23  evidence.

24         MS. PURDY:  Well, but if --

25         THE COURT:  And not saying your client is this

1    person, but a savvy person would just look at that and say,

2    "I'll create one on the same date and time that it says one was

3    exchanged.  Who knows what the substance of it was, but I'll

4    create it at that time."

5          That will be evidence that it actually happened, but

6    the substance isn't there.

7          MS. PURDY:  No.  So I -- Judge Barksdale, I think

8    what I would say is we have every interest in -- with

9    appropriate safeguards, of protecting our client's privacy

10   interest, to give them access to the things that they need to

11   corroborate this new theory.

12         So Mr. Rivera said for the first time, "We'd like to

13   see his contact information."  We can do an export and give

14   them a report that shows them all of the information relating

15   to his contacts.

16         If they want to know what apps are on the phone, we

17   can give them access, targeted access, to be able to identify

18   every single app that could have Photoshopped or manipulated

19   the messages.  We can give them that.  We have no opposition to

20   that.  It was never raised with us before this shifting theory

21   of what could have happened.  Now that they can't prove the

22   messages were Photoshopped, now maybe there's a burner phone.

23         If that's what they need, we have no opposition,

24   Judge Barksdale, no opposition at all to --

25         THE COURT:  Ms. Purdy --

1    MS. PURDY:  -- to giving them that.

2    THE COURT:  -- that's fine.  Tell me this.  You say

3  your primary issue is privacy.  Articulate that a little bit

4  more.  You've got a client who's the plaintiff, so he's come to

5  court, federal court.

6    How much is he asking for?

7    MS. PURDY:  1.75 million.

8    THE COURT:  He wants 1.75 million.  They believe he

9  fabricated these, and they might be right.  That's their

10  defense.  Shouldn't they be entitled to as much evidence as

11  possible in order to prove their defense before your client can

12  get $1.75 million?  He's given up some privacy by coming to

13  federal court.

14    They say they have protected measures in place:  a

15  confidentiality agreement a,nd provisions that other courts or

16  other parties have used to protect privacy.  Why won't that

17  work?

18    So if the concern is privacy, here's how we deal with

19  that.  It's not "We won't provide you this" or "we'll give you

20  what we think" -- "what we think you should have in order to

21  prove or disprove authenticity."

22    MS. PURDY:  So what I would say, Judge Barksdale, is

23  several of the cases that are cited in the parties's briefs

24  talk about first appointing a neutral third party to do the

25  examination.  They haven't offered that.  What they offered

1  was, "Give us the phone and let our expert do whatever he wants

2  with it."

3         THE COURT:  Well, isn't -- I mean, why -- if their

4  expert -- their expert can look at the phone and make his

5  findings.  The expert's not charged with doing -- combing

6  through private information that he has.  They're charged --

7  their expert is charged with a very specific task, right?

8  Identify -- prove the lack of authenticity of these Signal

9  messages and the photos of them.  Prove that for us.  Take this

10  image and prove that he made these up.  That's their charge,

11  the expert's charge, right?

12         MS. PURDY:  Yes.

13         THE COURT:  So why are you concerned?  The expert's

14  going to look through private messages that he has with

15  friends?  Like, are you worried about that?

16         MS. PURDY:  Well, yes -- yes, Your Honor.  That's

17  part of why we have specific protocols, why there's an exchange

18  of information if you're even going to give another party

19  access to a phone.  Or our preference would be a neutral third

20  party, which is often done in these kinds of cases.  And

21  there's --

22         THE COURT:  You know, cases -- you can point to all

23  the cases that you want in the world from the time phones first

24  became -- came into existence, the iPhone.  They're all so

25  different.  Every case is so different.  And we look at the

1    totality of the circumstances.

2           One thing that makes your case so unique is this

3    allegation that he's fabricated these text messages.  That puts

4    it in a whole different category, because if that's true, he

5    loses the whole case.  He doesn't get 1.75 million, period.  If

6    they're authentic, it's pretty strong evidence that there was

7    an agreement and he might get the 1.75 million.

8           You, to avoid an appeal that's reversible error,

9    should be like, "Have it.  Protect his privacy by doing this,

10   this, and this.  We want attorneys's eyes only on this.  We

11   want the expert to sign an agreement.  We want all of his

12   private information protected, but have at it."

13          Isn't that the position you should take in order that

14   you don't have this probably-reversible-error issue in not

15   giving them the discovery they need to try to prove their

16   defense?

17          MS. PURDY:  Judge Barksdale, we have every interest

18   in ensuring that they have the information that they need to

19   confirm what we have always known, which is that these messages

20   are authentic.  They are authentic --

21          THE COURT:  If that's the case, then take it.  Say,

22   "You're not going to find anything on this phone, folks.

23   They're authentic.  Have the image.  Let your expert do what he

24   wants and we will prove our point."

25          Maybe it will even help you settle if their expert

1  says, "I can't" -- "these look authentic to me.  Everything I'm

2  looking at says it's okay.  I'm not finding anything on this

3  phone that would indicate they've messed with" -- "I'm not

4  finding Photoshop; I'm not finding anything else that would

5  suggest these are not authentic. "

6         MS. PURDY:  And, Judge Barksdale, what I would say

7  is, first, in response to your order asking them to explain

8  what they needed and why and why they didn't have anything,

9  what is notable -- even though I know it's been struck -- is

10  that they did not attach a declaration from their expert

11  saying, "Well, I need the following six things.  I need access

12  to the phone to confirm the burner theory because I need this,

13  this, and this."  They don't have anything like that.

14         The allegation that these messages are fake is not

15  supported by any sworn statement.  I think it's very notable

16  that Davis Berg didn't attach a declaration saying --

17         THE COURT:  Well, it's essentially a Rule 11

18  statement, right?  Because it's in their pleading.

19         MS. PURDY:  Yes, but in response --

20         THE COURT:  They need a declaration as well to

21  support that defense?

22         MS. PURDY:  No, Judge Barksdale.  But my point is

23  that in response to a request for them to explain specifically

24  why they don't have what they need and what they need, they

25  didn't include an explanation from their own expert of what

1   they need.  We are hearing for the first time in this hearing

2   some of the things that they say that they need.

3          And throughout this case we have tried to communicate

4   with opposing counsel about what it is that they actually need

5   and why.

6          And first, I would say a bald allegation that

7   something is fake does not automatically entitle a party to

8   rummage through a forensic image of --

9          THE COURT:  It's not bald, right?  It's not a bald

10  allegation.  Tell me what -- why they think it's fake.  We

11  could go through a list of things they've provided the Court

12  that says they -- why they think it's fake.  It's not bald.

13         Of course it's -- and, they're good lawyers.  They

14  signed it with Rule 11 over them.  It's not a bald allegation.

15  It's a robust defense in this case.

16         MS. PURDY:  What I would say, Judge Barksdale, is

17  first of all, the objective evidence of manipulation that

18  they've identified is in response to a letter -- or an email in

19  February of '22 saying, "We're not going to pay you 10 percent.

20  Mr. Enquist didn't attach the screenshots."

21         Well, in December of 2021 they paid an invoice that

22  said it was for progress payment towards 10 percent net profits

23  owed.  So it's not objective evidence of manipulation that he

24  didn't attach a Signal message when they paid an invoice that

25  says what the payment terms were.

1    And then it's not objective evidence of manipulation

2  that my law firm specifically quoted from the Signal messages

3  in a demand letter that we gave them in September '22.

4    Mr. Rivera also said, "Well, they didn't show us any

5  of the messages before the lawsuit was filed."  Well, actually,

6  we did.

7    We attempted to mediate this case two times before we

8  filed it.  The mediation was aborted two times by Water Street

9  two days before each mediation.

10   We showed them the messages in a screen share.  We

11 actually wanted to give them the messages, but there was a

12 dispute over how much communications would be exchanged between

13 the parties.

14   At no point before we filed the lawsuit did they ever

15 say, "Mediation would make no sense here, counsel for Silverado

16 Capital, because these messages are fake.  Your entire theory

17 is fake."

18   There's no letter back to us from our demand letter

19 saying those things are fake.  There's nothing.

20   And then the remainder of their objective evidence of

21 manipulation in their reply is that Mr. Berg, who says he

22 doesn't use the word "carry" and the word "carry" isn't common

23 in the industry to speak about this, I don't know, Judge

24 Barksdale, if it's of interest to you, but we printed off some

25 articles this morning that talk about the term "carry" and that

1    it is used in this context to talk about how parties are paid

2    in connection with investing --

3           THE COURT:  All of this sounds like a great jury

4    issue.  I mean, right?  It sounds like you've got evidence on

5    your side to show they're authentic; it sounds like they have

6    some evidence on their side to say they're not authentic.

7    Great jury issue, right?  But let's get all of the discovery on

8    the table.  Let's get these experts to talk about authenticity

9    or not authenticity, what have you, and let -- it's a jury

10   case?

11          MS. PURDY:  No, Judge.

12          THE COURT:  Let Judge -- a bench trial, that's

13   great -- let Judge Howard decide, you know, what's true based

14   on all the evidence that's been collected.

15          MS. PURDY:  The two points I would say then, Judge

16   Barksdale, are, one, whatever the procedure will be for

17   analyzing this phone needs to have sufficient safeguards in it

18   because we haven't had -- it was -- originally we got an RFP

19   that said, "Give us the phone."  And then many, many, many

20   months later we got, "All right.  Give us the phone.  Here,

21   look at this.  We're going to file our motion in a week."

22          Second, what I would say is the fact that last Friday

23   we learned that they have not preserved cell phone images of

24   any of the relevant witnesses in this case on the Water Street

25   side I think is a significant issue in this case because now

1   what's going to happen is their expert is going to get to

2   rummage through our client's forensic image of his phone based

3   on an allegation, nothing from their expert saying what

4   anomalies he has found in the information he's been provided to

5   date.

6          On the other side is what's on Davis Berg's phone and

7   what's on Gilchrist Berg's phone and Ian Black's phone and Josh

8   Resnick's phone.

9          This lawsuit was filed a year ago.  The demand letter

10  was given to them in September of '22.  And we learned on

11  Friday that they have not forensically imaged any of their

12  witnesses's phones.

13         And so what we would ask is that they do what is

14  always required in discovery, particularly for key witnesses

15  like that, and they would forensically image their client's

16  phone and they would review that -- those information, and the

17  Signal app in Davis Berg's phone and review and see if there's

18  any text messages or WhatsApp messages or other messages among

19  the parties in this case, if they're even still here, while at

20  the same time just alleging that our client has fabricated

21  evidence and brought a federal lawsuit that could ruin his

22  livelihood and reputation, without any direct evidence from

23  their own expert that anything that we have given them is

24  falsified or manipulated in any way.

25         So as long as there's sufficient safeguards and a

1    procedure, we do have a -- they want the contact information,

2    they want to tell us what they're going to look for --

3              THE COURT:  They want the image.  Tell me what you

4    want.  If I said, "Hand over the image, the same image that

5    your expert looked at," what protection would you want?

6              MS. PURDY:  Well, so first, Judge Barksdale, what I

7    would say again, to be clear, there is no, like, laptop image

8    that they don't have.

9              So I know these are two different things that we're

10   talking about --

11             THE COURT:  We're talking just about the cell phone

12   right now.

13             MS. PURDY:  Yes.  Okay.  For the cell phone, what we

14   would want is a procedure where there is advanced explanation

15   of what the expert is going to extract and what they are

16   reviewing and the date ranges of what's getting reviewed.

17             One piece of this that I don't understand at all and

18   I don't think has any basis to rummage further is this idea

19   that Mr. Enquist was emailing himself Signal messages to

20   Photoshop.

21             And, one, we've given them --

22             THE COURT:  Wait.

23             MS. PURDY:  -- that's something that can be taken

24   care of in regular discovery.  We collected the PST file from

25   Mr. Enquist's email.  On his phone we've -- it's been deduped

1    from his phone to his laptop.  So there's nothing to look at in

2    terms of looking behind his additional emails.

3              If there's other keyword searches they want us to run

4    or searches they want us to do with respect to that, we can do

5    that in the normal discovery process, but they haven't

6    explained to us anything that they want to do relating to that.

7              So with respect to looking at emails, we don't think

8    that that should be within the scope of any review of the

9    forensic image of the iPhone anyways because we have the entire

10   PST file.

11             We would like to know in advance what they are

12   looking through, date ranges of what they are looking through,

13   so that we can have a discussion.  If there's some particularly

14   sensitive information or something that we need to work through

15   with opposing counsel, we would like to have the opportunity to

16   do that in advance, as opposed to their expert gets to review

17   the entire image.

18             The other thing we're concerned about is even if he's

19   given direct access, that doesn't mean he should be permitted

20   to share with counsel things that he finds, that he happens to

21   come across, privileged communications that Mr. Enquist may

22   have with his lawyers, in his review of the forensic image of

23   the phone.

24             And so we need to have a process that protects

25   against waivers of privilege, disclosures of privileged

1   communications, disclosures of private images, banking

2   information, all of that.  And we think the best way that you

3   can handle that is to tell us in advance what you're looking

4   for and where you're looking for it so that the parties can

5   work through if there's some issue relating to that.

6           THE COURT:  The procedures that they provided to you,

7   do they have any of that?

8           MS. PURDY:  It's much less specific than that.

9           THE COURT:  What do they --

10          MS. PURDY:  It's a very general procedure.

11          THE COURT:  What does it say about attorney/client

12  privileged stuff?

13          MS. PURDY:  I don't have the whole -- I don't have

14  the draft with me, unfortunately.  Mr. Rivera has it.

15          THE COURT:  So procedures to give advanced notice of

16  what the expert will be looking at --

17          MS. PURDY:  Yes.

18          THE COURT:  -- on the phone, including the date

19  ranges?

20          MS. PURDY:  Yes.

21          THE COURT:  A procedure for protecting anything

22  that's privileged or work product?

23          MS. PURDY:  Yes.

24          THE COURT:  What else?

25          MS. PURDY:  I think those are the main items.  What

1    are you wanting to pull, where -- you know, where are you

2    trying to pull it from.

3            Most concerned about privacy, privilege, and work

4    product, and disclosure of that to counsel for Water Street.

5            THE COURT:  What are your -- what's your expert's

6    opinion -- he gives me opinions on what?  Tell me his, like,

7    bottom-line opinion.

8            MS. PURDY:  His bottom-line opinion is that the 16

9    screenshots that he has reviewed show no evidence of

10    manipulation, no evidence of Photoshop, no -- fully consistent

11    with having been not only from the date created, but from

12    looking at the images themselves, that they were taken from the

13    Signal app contemporaneously when they were -- or roughly

14    contemporaneously with when they were taken based on the auto

15    delete function.

16            THE COURT:  Contemporaneously or roughly

17    contemporaneously?

18            MS. PURDY:  Yeah.  So, for example, there's messages

19    that were exchanged on March 21st of 2021.  They were

20    screenshotted on the 24th.  When you look at the image itself,

21    it doesn't show any evidence of Photoshop or manipulation or

22    changing any words.  And even the timer dial that counts down

23    on when the auto delete goes down to seven days is

24    consistent -- like fractionally consistent with how far it has

25    gone down, for example.

1          THE COURT:  Okay.  Anything else?

2          MS. PURDY:  The only other thing I would say, Judge

3    Barksdale, is that, again, on the -- with respect to the

4    laptop, they literally have received exactly what our expert

5    has received.

6          THE COURT:  Which is?

7          MS. PURDY:  The targeted -- they've received targeted

8    forensic collections of emails, documents, social media

9    accounts, and the images themselves, the Signal -- and,

10   actually, there's an iMessage screenshot as well.  They have

11   received literally exactly what our expert has received, and

12   substantially more, in fact.

13         THE COURT:  More than what your expert received?

14         MS. PURDY:  Yes.

15         THE COURT:  Have you taken depositions in the case

16   yet?

17         MS. PURDY:  We are actually -- they're -- this is

18   another reason why we think it makes sense to pump the brakes

19   slightly, Judge Barksdale.  They're taking Mr. Weil's

20   deposition on Tuesday of next week.

21         THE COURT:  They're able to take his deposition

22   without...

23         MS. PURDY:  They asked for his deposition and we made

24   him available to them.

25         THE COURT:  Okay.

```
 1          MS. PURDY:  We think, you know, take his deposition
 2   in the normal course, as they have requested.  I'm sure their
 3   expert, Mr. Sharp, will be attending the deposition.  And
 4   that's another way to alleviate some of the concerns here, is
 5   they can ask a lot of the questions that -- on these new
 6   theories of burner phones and whatnot.  So it may make sense to
 7   hold off on even worrying about disclosure of the forensic
 8   image for the time being because they're about to take his
 9   deposition.
10          THE COURT:  When is it?  What date?
11          MS. PURDY:  June 11th at 10 a.m.
12          THE COURT:  Thanks.
13          Mr. Rivera, do you want to respond to Ms. Purdy?
14          MR. RIVERA:  Just briefly, Your Honor.
15          THE COURT:  She said she showed you the screenshots
16   during settlement discussions, but you suggested otherwise?
17          MR. RIVERA:  No, Your Honor.  I said that we hadn't
18   received copies of the screenshots.
19          THE COURT:  Okay.
20          MR. RIVERA:  We do acknowledge that it was shared at
21   that time; however, in a screen-sharing through Zoom is how it
22   was done.
23          THE COURT:  Okay.
24          MR. RIVERA:  One, we were unable to make a copy of it
25   that we could retain; and two, obviously there's no metadata or
```

1    anything that we're able to see with that, say, video image

2    that was coming through on the Zoom.

3         THE COURT:  Okay.

4         MR. RIVERA:  But Ms. Purdy is correct that in I

5    believe it was January of 2023 they were initially shown to us,

6    and obviously we knew that was going to be an issue if the case

7    were filed, which is why we sought them, the native versions of

8    those messages, literally on the day of our 26(f) conference.

9         THE COURT:  Why didn't you -- why don't you have

10   images of your main witness cell phones?

11        MR. RIVERA:  Well, Your Honor, we did issue a

12   litigation hold to our clients.  We have not collected a

13   forensic image of their phones specifically because it hasn't

14   become a -- an issue as far as we're talking about what has

15   transpired here and what we're talking about on the issue

16   before the Court, specifically on getting, one, the information

17   that was provided to Silverado's expert, and two, the

18   information that bears on the authenticity of the --

19        THE COURT:  Screenshots.

20        MR. RIVERA:  -- screenshots that Mr. --

21        THE COURT:  Because even a forensic image, the Signal

22   messages would have already disappeared?

23        MR. RIVERA:  That is correct, Your Honor.

24        THE COURT:  And it still had -- to date, it would

25   still have the Signal traffic information?

1      MR. RIVERA:  Well, Your Honor, what's going to remain

2  on a -- let's just say a Signal message after deletions occur,

3  Ms. Purdy is correct, it will have records of a phone call

4  being made through the Signal app.  Otherwise, it was just

5  going to have the content of who and when did they --

6      THE COURT:  My question was really is that still on

7  there?  You didn't need an image way back when for that

8  information; it's still going to be present?

9      MR. RIVERA:  Presumably so, yes, Your Honor.

10      THE COURT:  Signal keeps that?

11      MR. RIVERA:  The Signal application on the telephone,

12  yes; not Signal the entity.

13      THE COURT:  Okay.  Ms. Purdy doesn't think you need

14  the whole image of the phone, just targeted pieces of it, and

15  that you haven't really conferred with her on specific targeted

16  pieces.

17      She also complains that you didn't submit any kind of

18  declaration from your expert explaining what he needs to do his

19  expert report.

20      MR. RIVERA:  That -- and I'll address those -- those

21  points, Your Honor.

22      As far as what we are looking for, some of the

23  theories that we've talked about today -- and they're not -- I

24  wouldn't say that they are new theories, but they are just ways

25  that these manipulations could have occurred.  You know, I've

1    identified some of the things that we can look for to see

2    whether or not those are there.

3            But, for example, Ms. Purdy talks about a list of

4    apps.  Well, we would also be looking for the files created by

5    those apps, whether they've been deleted or not.  Meaning if

6    there are Photoshop files on the phone, even though there's not

7    a Photoshop application on there, then that will bear on our

8    expert witness's report about whether there is any indication

9    that the party has used Photoshop, and also gives us the

10   eligibility to better depose Mr. Enquist and Silverado's

11   30(b)(6).

12           And Your Honor asked about what was included in the

13   proposed protocols.  And what it does specify there is that

14   Water Street is seeking to obtain information, discovery,

15   regarding the following topics or issues:

16           Determination of whether the Signal messages and

17   other messages produced in discovery and the associated

18   metadata for those messages are authentic; determination of the

19   original date of creation of the screenshots of the Signal

20   messages produced in discovery; identification of any system

21   operations, specific commands, or other evidence of process or

22   events by or during which data have been moved, modified,

23   deleted, or erased from the subject phone, whether through

24   normal operation or otherwise, that may explain or affect the

25   presence or absence of the information falling within this

1   designated scope of inspection; confirmation there have been no

2   deliberate attempts to compromise the integrity of the

3   information on the phone; and identification of any data,

4   including the screenshots of the Signal messages, which was

5   transferred from Mr. Enquist's phone to his computer systems

6   and vice versa and the dates of said transfers.

7           Ms. Purdy is correct that the PST file of the emails

8   have been produced -- or elements -- responsive documents from

9   the PST have been produced.

10          We are talking about Apple products.  One way that

11  transfers can be made between them is AirDrop when they are

12  near each other, which would not be necessarily an email

13  communication.  In fact, in the response there's even talk

14  about a physical transfer using a data cable, presumably,

15  between the phone and the computer, which purportedly explains

16  the differences in some of the metadata on these screen

17  messages.

18          As far as the deposition of Mr. Weil, no, we don't

19  feel fully prepared to take his deposition before we have the

20  ability to see what was provided to him and an opportunity for

21  our expert to take a look at it.

22          Presently we have a July --

23          THE COURT:  Well, you can ask him in the deposition,

24  "What was provided to you?"  And you have his report.

25          MR. RIVERA:  Well, correct, Your Honor.  And it says

1   he received the forensic image of the phone, you know.  Well,

2   we can ask him about his --

3           THE COURT:  You can ask him more about that, can't

4   you?

5           MR. RIVERA:  Correct.  We can ask him more about what

6   he actually reviewed, but what we can't ask him is, "Why didn't

7   you look at X, Y, and Z?  Wouldn't that have also" --

8           THE COURT:  Why can't you ask him that?

9           MR. RIVERA:  Well, we don't know what X, Y, and Z is

10   without the -- without the forensic image.  Meaning he was

11   provided the entire forensic image.  Our expert can look

12   through and say, "Oh, this file has a bearing on it.  This file

13   has a bearing on it," you know, "this transfer shows" whatever

14   it might show.  And we can't question him specifically on those

15   issues without just asking, "Was there anything on there that

16   you didn't look at that could have affected your" -- "your

17   opinion here?"  Which is not a tenable place to be in.

18           The reason that we set the deposition for June 11th

19   is we have a discovery deadline presently of July 1st.  Now,

20   counsel have discussed -- and I think may be jointly

21   presenting -- a motion to extend that deadline considering some

22   of these issues that we're working through for a couple of

23   months.  But that's why we got the deposition on the calendar.

24           And in addition, as Your Honor is probably -- likely

25   remembers, we do have a motion for extension as far as

1 disclosing our forensic expert's report based on the outcome of

2 this motion and whether the forensic image is provided or not.

3 　　　　　But obviously we would prefer to have all the

4 information necessary to depose their expert, as well as

5 Mr. Enquist himself.

6 　　　　　THE COURT:  Ms. Purdy suggested a procedure that

7 would require your expert to give advanced notice of the parts

8 of the phone -- the image he's going to explore.  Any issue

9 with that?

10 　　　　　MR. RIVERA:  Well, Your Honor, I question how

11 workable that is and how quickly it can be undertaken when

12 we're talking about a -- you know, even if we extended

13 discovery for two months, that still only gives us about

14 90 days now to complete discovery, to prepare for any

15 dispositive motions.

16 　　　　　And so, you know, we believe that the procedures here

17 detail the scope of the inspection that we're looking --

18 looking to conduct here.

19 　　　　　THE COURT:  Does that -- how does that protect

20 attorney/client work product?

21 　　　　　MR. RIVERA:  Your Honor, those procedures --

22 　　　　　THE COURT:  Is that separate?  Is that in the

23 confidentiality agreement or somewhere else?

24 　　　　　MR. RIVERA:  Well, the confidentiality agreement does

25 provide a clawback, I believe, for incidental or accidental

1  disclosure, but specifically -- so the way the procedure works

2  is that E-Hounds, which is the corporate entity that our

3  expert -- our forthcoming to-be-disclosed witness, Adam Sharp,

4  works for, would be supervised by Silverado in looking --

5  basically in creating the image -- well, that image has already

6  been created.

7           Next, Silverado has the opportunity and is given the

8  deliverable to look through and mark items as privileged,

9  remove items --

10          THE COURT:  Before it gets to you?

11          MR. RIVERA:  -- as privileged.  Before it gets to us.

12          THE COURT:  So how does it work logistically?  Your

13  expert provides a draft of something to them --

14          MR. RIVERA:  Well --

15          THE COURT:  -- to pull stuff out if they --

16          MR. RIVERA:  -- I realize now, because the forensic

17  image has already been taken, that this first step on here is

18  actually unnecessary, that's in this protocol.  So what we

19  would really -- what we're asking is for the Court to allow

20  plaintiff's counsel to go ahead and remove any privileged

21  documents or make them unreadable as privileged.

22          THE COURT:  Remove from what?

23          MR. RIVERA:  From the forensic image.

24          THE COURT:  Before it gets to your expert?

25          MR. RIVERA:  Correct.  They can do that before it

1   goes to the expert.

2           THE COURT:  Ms. Purdy, is that possible?

3           MS. PURDY:  Judge Barksdale, I'm not sure that it's

4   possible, especially when you consider in light of the

5   allegations in this case of manipulation and whatnot, for us to

6   preemptively delete, or something, messages and images on a

7   phone.  I'm not sure how we would possibly do that without

8   creating another issue and allegation.

9           THE COURT:  Do you have any other suggestions on

10  addressing attorney/client or work product?

11          MR. RIVERA:  Well, Your Honor, there would be a

12  privilege log created for things that are removed as privileged

13  that would be served --

14          THE COURT:  Created by who?

15          MR. RIVERA:  By Ms. Purdy's firm.

16          THE COURT:  I'm sorry, but if your ex- -- we're

17  talking about just the expert getting the image.

18          MR. RIVERA:  Correct.

19          THE COURT:  They're worried about the expert having

20  the image of his cell phone and on there being work product

21  attorney/client privileged information.  Okay.  How do you want

22  to address that?

23          MR. RIVERA:  Well, that was --

24          THE COURT:  Taking it out, combing it out before they

25  give the image to your expert Ms. Purdy says won't work.  Do

1   you have other ideas?

2        MR. RIVERA:  Well, Your Honor, our expert is bound by

3   the confidentiality agreement in this case.  I would be happy

4   to enter into a stronger confidentiality agreement and have our

5   expert agree to it, specifically with regards to this forensic

6   image about, you know, what is our expert looking -- able to

7   share with us even marked as attorneys's eyes only.

8        THE COURT:  Does he have a plan in place?  Let's say

9   he gets this image.  Does he have a plan already in mind

10  where -- what is he going to look for when he gets this image?

11       MR. RIVERA:  Your Honor, I believe what the plan

12  would be is to first create a Excel file, I believe is the way

13  it would be done, to list the files, just creating a list of

14  files, file types and dates, by which we can try to focus

15  his -- his search from there.

16       If Your Honor wants us to, you know, share that Excel

17  list of what files that he wants to look at with opposing

18  counsel, and then they would have the opportunity to object on

19  the basis of privilege, then I think that is a procedure that

20  we're able to use.

21       THE COURT:  And your problem with a similar procedure

22  before was just timing?

23       MR. RIVERA:  Well, yes, Your Honor, it's timing and

24  it's the question of if they're asking us to in advance say

25  specifically what we're going to be looking at or for before we

1  receive the forensic image, you know, we have some things that

2  we know that we're looking for, but we don't know everything

3  that we might be -- you know, that might stick out of the sand,

4  as it were, as giving our expert concern that this could be

5  relevant to.

6          THE COURT:  Okay.  All right.  Just one second.

7      (Pause in proceedings.)

8          THE COURT:  All right.  Anything else?

9          MR. RIVERA:  No, Your Honor.

10          THE COURT:  The deadlines, I can -- I can tinker with

11  them right now.  I was asking the courtroom deputy to get in

12  touch with Judge Howard's courtroom deputy about Judge Howard's

13  thoughts on the deadlines here.

14          If both parties want to look at the Case Management

15  and Scheduling Order as amended and make some modifications, we

16  can do that now; we can do that later.

17          MR. RIVERA:  I believe we're prepared to -- or

18  counsel for defendant is prepared to do that now.  I'll let

19  Ms. Purdy speak for her --

20          MS. PURDY:  Yeah, I don't -- I don't have it right in

21  front of me, Judge Barksdale, but we did discuss ahead of this

22  hearing moving deadlines back a little bit, so I'm sure we can

23  collaborate --

24          THE COURT:  Okay.

25          MS. PURDY:  -- especially if somebody has a copy.

1    THE COURT:  All right.  So right now we have the

2  deadline for the defendant to disclose its expert is 20 days

3  after ruling on the motion to compel or receipt of the

4  information underlying it, and then the rebuttal expert was

5  extended accordingly.

6    And then from there we also have coming up discovery

7  by July 1st.  Does that sound right?

8    MR. RIVERA:  Yes, Your Honor.

9    THE COURT:  Discovery July 1st, dispositive and

10  Daubert motions by August 1st, mediation deadline by August

11  9th, final pretrial conference to January 2025, and a bench

12  trial -- there it is -- on February 3rd, 2025.

13    So how would you like to address those?

14    MR. RIVERA:  Well, first, Your Honor, mediation has

15  already occurred, so we don't need to move that deadline.

16    We discussed moving the July 1 date to September 1,

17  two months.  And then we would be looking to move the other

18  upcoming deadlines --

19    THE COURT:  Everything by two months?

20    MR. RIVERA:  Yes, Your Honor.

21    THE COURT:  And Ms. Purdy, the plaintiff's position

22  on that?

23    MS. PURDY:  We agree.  We want to make sure that the

24  parties --

25    THE COURT:  You want that too?

1          MS. PURDY:  -- can complete discovery.  Yes.

2          THE COURT:  So two months, everything?

3          MR. RIVERA:  Correct, Your Honor.

4          MS. PURDY:  Yes, Your Honor.

5          THE COURT:  Is that going to be it?  Is that

6     realistic?

7          MR. RIVERA:  We hope so.

8          MS. PURDY:  Judge, the only thing that occurs to me

9     as we're discussing whatever this procedure's going to be is

10    that it may end up taking time, and I can see there being

11    potential disputes relating to it.

12          So, for example, one thing that I'm concerned about

13    that occurred to me beyond attorney/client and work product is

14    my client -- that phone has my client's commun- -- he has since

15    changed phones.  His physical phone is sitting in his -- our

16    expert's -- a drawer, being preserved so that it can't be --

17    there's no preservation issues.

18          But it has all kinds of confidential, proprietary,

19    and sensitive information not only relating to his family, but

20    the other clients that he services.  As detailed in our

21    compliant, he's also a whistleblower for the federal

22    government.

23          So I think there's the possibility that it's going to

24    take a little more time to work through some of these points.

25          And we're going to need to I think be collaborative

1  on really being clear about what the expert is looking for and

2  what he needs because, again, we're not trying to stand in the

3  way of legitimate discovery to confirm the authenticity of

4  these messages, but it's not appropriate under the Rules of

5  Civil Procedure to allow their expert to just poke around at

6  whatever he wants and then he sort of promises he won't

7  disclose it to them, right.  So it's going to take, I think,

8  some thoughtfulness to figure out how we would even do that.

9        I can tell you some things that I -- we can give

10  you-all to move things along ahead of figuring out that

11  process, because I know that we can export a report that gives

12  all of the contacts and they can ahead of time look and see if

13  they can find any evidence of a fake Davis Berg phone number.

14        We can give them the report -- literally I think we

15  can give it to them in the next day -- that lists every single

16  app on the phone, which would give them a lot of information

17  about whether Photoshop could be used, because that's the only

18  information that tells you if it's on there.  And every other

19  type of app that's been on the phone.  So if there's a metadata

20  manipulator or whatnot.

21        We can give that to them right now to get the ball

22  moving because we don't have anything to hide, but I'm --

23        THE COURT:  You talked about an Excel -- his expert

24  would present -- produce an Excel spreadsheet essentially

25  explaining what files are on there.  Do you have that?

1          MS. PURDY:  We have -- so I don't know if maybe
2    Mr. Rivera and I are kind of talking about the same thing, it's
3    unclear to me, but what I know I can do is we can create
4    reports, Excel reports, that tell you every app on the phone.
5    We can tell you all the contacts on the phone.
6          I don't know because I haven't checked, because we
7    haven't communicated about it, if there's also an Excel that
8    tells you every file on the phone.  If there is a way to do
9    that, we can also certainly do that and start looking through
10   that ourselves.
11         I just want to make sure that we're being mindful of
12   how we do this so that we're not coming back here in front of
13   you in six weeks because we say they want access to this thing
14   that is our client's, you know, sensitive information relating
15   to other work, and they say, "Well, we don't know that because
16   we haven't looked at it," and we're getting into an issue that
17   requires the Court's assistance and then we're pushing dates
18   out again.
19         THE COURT:  I mean, both sides have legitimate
20   points.  I mean, I want to give you all the discovery that you
21   possibly need to show these are not authentic.  If that's your
22   client's position, if that's their main defense, which it
23   sounds like it is, it will result in dismissal of the case if
24   this was fraud.  I want you to have all of the evidence that
25   you want.  Everything you want, you get.

1           Ms. Purdy, I want your client's information

2    protected.  I don't want attorney/client privileged information

3    shared with the other side; don't want work product shared with

4    the other side; don't want federal whistleblower information

5    shared with the other side.

6           So how do you get that done?  You guys are really

7    good lawyers, really good lawyers.  Couldn't you have figured

8    this out?  Or can you figure this out between now and the end

9    of the week?  Some sort of procedure, knowing that I want to

10   give your side everything I possibly can with respect to

11   whether these are authentic, knowing that I want to protect

12   your client's personal, private, protected, privileged

13   information.

14          You two are the experts, in essence.  Knowing this,

15   knowing what I want to give you and what I want to do for your

16   client, can you get together and figure out some procedure that

17   will make this work?

18          MS. PURDY:  What -- Judge Barksdale, what we actually

19   suggested many months ago, and I suspect that the -- there may

20   be -- we may all be inclined to take me up on this suggestion

21   from months ago, is if we get on a -- on a Teams call with our

22   experts and each other, and we work through:  What do you need?

23   What can we give you?  How do we work through this?  How do we

24   come up with a procedure that allows them to have access that

25   they need while protecting our client's interest?

1          And Mr. Rivera and I can certainly work through a lot

2    of that directly ourselves, and then we can involve the subject

3    matter experts, who are the forensic experts in the field, as

4    we need them.

5          THE COURT:  Can you get this done by the end of the

6    week?

7          MR. RIVERA:  Your Honor, I'm not sure if we'll be

8    able to get our expert on by the end of the week.  Although, I

9    don't know that we necessarily need the experts for the call

10   when what we're really doing is trying to knock out a --

11         THE COURT:  Well, your expert --

12         MR. RIVERA:  -- protocol.

13         THE COURT:  You might want your expert --

14         MR. RIVERA:  We might.

15         THE COURT:  -- on there, because if they say, "We

16   really don't want you to have access to this portion," your

17   expert might say, "Oh, I really have to have that in order to

18   verify the authenticity."  You might not know the answer to

19   that.

20         Does it make sense to have the experts and the

21   lawyers talk?

22         MR. RIVERA:  Well -- well, yes, Your Honor.  I was

23   just saying, particularly for scheduling purposes, to be able

24   to have it done by the end of the week --

25         THE COURT:  All right.

1          MR. RIVERA:  -- that would maybe be --

2          THE COURT:  How about two weeks from now?  That's

3    14 days.

4          MR. RIVERA:  Yes, Your Honor.

5          THE COURT:  I know experts are really busy and

6    lawyers are really busy.  It might be asking too much, but that

7    would be the ideal, would be to get this resolved within the

8    next couple weeks.

9          MR. RIVERA:  If Your Honor is asking for us to submit

10   a joint protocol to Your Honor within two weeks, I think we'd

11   be able to do that.

12         THE COURT:  Or -- either a joint protocol, you can

13   agree to that yourselves without me getting involved, or a

14   notice to the Court on what issues remain, if any.

15         MR. RIVERA:  Yes, Your Honor.

16         THE COURT:  Does that sound like a plan?

17         MR. RIVERA:  Yes, Your Honor.

18         THE COURT:  Two weeks from today?

19         MR. RIVERA:  Yes.  I believe that will be --

20         THE COURT:  Which is what?

21         MR. RIVERA:  The 17th, Your Honor.

22         THE COURT:  17th?

23         All right.  Ms. Purdy, does that sound like a plan?

24         MS. PURDY:  Yes, yes, Judge Barksdale.  I think -- I

25   suspect that we'll be able to work through probably just about

1    everything, and then if we can submit something to you within

2    the next two weeks.  If there's some specific hurdle that we

3    need your assistance with resolving, then we can -- maybe we

4    can just have a Zoom hearing on telephone call if we need your

5    assistance.

6              THE COURT:  And that's fine.  The notice that's filed

7    within two weeks of today can simply say either "the issues

8    have been resolved" or "we need a telephone conference," and

9    give me just three options that work for both of you.  You

10   don't have to even explain what issues are still outstanding.

11             The scheduling order, want to look at that still?

12   You want two months out?  What I asked was, "Is that

13   realistic?"  I got a hesitancy there.

14             MS. PURDY:  What I'm -- what I'm thinking, that

15   might -- so two -- two points, but one specifically to

16   scheduling first, Judge Barksdale.  What I'm thinking is I

17   think we know we need more time, but it might make more sense

18   to decide how much time we need when we are able to get back to

19   you in two weeks about working through all of this.

20             But if the Court's inclined to just do the 60 days

21   now, I think -- you know, we'll figure it out.  We'll get to

22   the deadline if we need to, but I'm just wondering if it makes

23   sense to wait only because we don't know what we don't know

24   yet.

25             MR. RIVERA:  Your Honor, I'm inclined to agree with

1　Ms. Purdy as far as we can include in that two-week -- or our
2　status report within two weeks.
3　　　　　　THE COURT:  You can give me some deadlines then?
4　　　　　　MR. RIVERA:  Yes.
5　　　　　　THE COURT:  Maybe even your expert report, you'll
6　have a definitive deadline for that.  The rebuttal report, all
7　the other deadlines, taking a realistic look at what discovery
8　you've got and what you'll need and when you can try the case.
9　　　　　　Sound like a plan?
10　　　　　MR. RIVERA:  Yes, Your Honor, that will work.
11　　　　　THE COURT:  Ms. Purdy?
12　　　　　MS. PURDY:  Yes, yes, Judge.
13　　　　　The only thing that I wanted to raise, because I'd
14　like to get it -- if we can get it resolved now, all the better
15　because we're all here, is that the witnesses for Water
16　Street's phones not being forensically imaged.
17　　　　　There could be text messages or communications on
18　those phones between the witnesses, among the witnesses, with
19　Mr. Enquist.  I don't know what their -- they haven't preserved
20　them.  We haven't received anything from them in discovery
21　obviously from their phones because they haven't been preserved
22　and forensically imaged.
23　　　　　And I -- I think we can work through it just fine if
24　we have to, but I think that under the Rules of Civil Procedure
25　they're required to forensically image the key witnesses's

1  phones, which are --

2          THE COURT:  Where?  Point to the rule.

3          MS. PURDY:  Well, it's relevant and --

4          THE COURT:  There's no rule that says you have to

5  preserve a cell phone as soon as a lawsuit is imminent.  That's

6  not true.

7          MS. PURDY:  I agree, Judge Barksdale, but now that

8  we've been litigating the case for a year, we're concerned that

9  there could have been relevant communications and information

10 on particularly Davis Berg's phone.

11         THE COURT:  How did they communicate?  Did they

12 communicate by text and the disappearing app, both?

13         MS. PURDY:  There are limited communications.  In

14 fact, one of the exhibits to our complaint is an iMessage

15 between Mr. Berg and Mr. Enquist.

16         THE COURT:  And you have it?

17         MS. PURDY:  Yes.

18         THE COURT:  So --

19         MS. PURDY:  Well, we have -- but I don't know what

20 other communications -- maybe there's communications between

21 Gilchrist Berg and Davis Berg confirming "Yes, we agreed to pay

22 him ten percent, but we're not paying it now."

23         I have no idea.  They haven't searched, they haven't

24 preserved any of that.  It could all be deleted by now.  I have

25 no idea.  We have no -- maybe they communicate by WhatsApp.  I

1    have no idea.

2          THE COURT:  You asked for communications between the

3    Bergs and they provided nothing; is that what you're saying?

4          MS. PURDY:  They provided email communications.

5          THE COURT:  But no text messages?

6          MS. PURDY:  No text messages.

7          THE COURT:  And what's happening there?

8          MR. RIVERA:  Well, Your Honor, you are correct that

9    there's no obligation to create a forensic image at the outset

10   of a lawsuit.  In fact, that's what the case law talks about,

11   is the expense of requiring a party to do that.  We have issued

12   and did issue litigation holds, as is customary, at the

13   beginning of the case.

14          I will tell Your Honor that these are hedge fund

15   analysts and owners who are old school and do most things by

16   telephone.  And so we've been told, and we believe it to be

17   true, that there are no relevant text messages here between our

18   client's personnel.

19          But as I represented to Ms. Purdy on Friday when we

20   discussed this issue, we are going back and confirming that, as

21   well as doing manual inspections of the cell phones to

22   determine whether we need to do a forensic image of the cell

23   phones.

24          THE COURT:  So what's the issue, Ms. Purdy?

25          MS. PURDY:  Judge Barksdale, if they're going to go

1   back --

2          THE COURT:  You want me to order him to do an image?

3   I'm not going to do that right now.

4          MS. PURDY:  Okay.  Well, Judge Barksdale, the concern

5   that we have is that we served a request for admission in this

6   case asking if they had any original Signal messages between

7   Mr. Enquist and Davis Berg, any copies, any copies of copies,

8   any version whatsoever.

9          We know, because they're still on Mr. Enquist's

10  phone, that he has original messages on his phone from before

11  the auto delete was set.

12         So we've been told they have no messages, but there

13  should be messages, if they were not deleted by Mr. Berg, on

14  the phone, which raises a concern to us of whether there are

15  other communications that are relevant to this case that have

16  not been produced or that have been deleted that might be

17  between Mr. Berg and Mr. -- between Davis Berg and Gilchrist

18  Berg, for example.

19         And so that's the only reason why I'm raising this

20  now, is we just learned this on Friday.  And we want to move

21  things along to ensure that -- and so if Mr. Rivera is going to

22  manually check his client's phone to see if there's any

23  communications and they need to amend their requests for

24  admissions, that's okay, but we're just concerned about --

25  there's a serious allegation that our client spoliated

1   evidence, and we don't have any evidence from the other

2   witnesses relating to anything on their phones.

3           THE COURT:  And you have not taken their depositions

4   to ask them about communications or anything like that?

5           MS. PURDY:  We have not.  The first deposition in

6   this case was going to be Mr. Weil's deposition next week.

7           THE COURT:  What did you do to collect the discovery

8   from your clients if they're old school?  Did you just say, "Do

9   you have any text messages," they said "no," that was it, or

10  was it more robust than that?

11          MR. RIVERA:  It is more robust than that, Your Honor.

12  We did conduct a -- a full search of the entire servers for the

13  company.

14          THE COURT:  And then you produced emails?

15          MR. RIVERA:  Correct, Your Honor.

16          THE COURT:  But text messages would not be on the

17  servers of the company necessarily, would they?

18          MR. RIVERA:  They would not, Your Honor.

19          THE COURT:  So what did you do with those?

20          MR. RIVERA:  For those?

21          THE COURT:  How did you collect those?  How did you

22  determine there are no text messages?

23          MR. RIVERA:  For those, we did talk to the

24  individuals who would have been potentially in contact with

25  Mr. Enquist and about these two securities at issue, where we

 1   were informed that they didn't have text messages about --

 2   around them.

 3           THE COURT:  So your clients just -- you said, "Hey,

 4   clients, do you have text messages on your phones about any of

 5   this," and they said "no" and that was it?

 6           MR. RIVERA:  With regard to the text messages aspect

 7   of the collection, yes, Your Honor.

 8           THE COURT:  And how does that address Ms. Purdy's

 9   concern that the Signal app wasn't set to auto delete for seven

10   days prior to that auto deletion function being added and that

11   there are Signal messages there?  What have you done to collect

12   those?

13           MR. RIVERA:  Well, Your Honor, Ms. Purdy and I spoke

14   about that on Friday, when this came to light.

15           More specifically, we mediated the case last week.

16   And without getting into the details of what happened there,

17   during the course of that, I realized that there were -- there

18   was an exhibit -- or something was transferred in discovery

19   that reflected Signal messages before the automatic deletion

20   setting was put into place, which I identified in an email to

21   Ms. Purdy actually maybe on Thursday, or early Friday, it gave

22   me cause to go back to my client and confirm that these

23   actually do or do not exist on my client's cell phone.  And

24   that's what led to the discussion that has now been brought up

25   here, Your Honor.

1        THE COURT:  Right.  What's your plan to figure out

2   whether there's text messages or Signal messages on there

3   besides just asking?  What's the plan?

4        MR. RIVERA:  Meeting with the individual in question

5   with their cell phone to have them show me that if they go into

6   the application, there are no messages there.

7        THE COURT:  And is your expert taking part in this

8   too?

9        MR. RIVERA:  Our expert was not going to take part in

10   this.

11        THE COURT:  This is just sort of a rudimentary,

12   "Let's see where your text messages are.  Let me see.  Okay.

13   There are none"?  Or you are more advanced than that?  You're

14   able to determine whether there's text messages on there?

15        MR. RIVERA:  No, Your Honor, it would be more of the

16   rudimentary "Let me see what you have here" and determining if

17   there's anything that should have been produced in discovery.

18        THE COURT:  And your client says they don't

19   communicate by text in regards --

20        MR. RIVERA:  Generally, no, they don't, Your Honor.

21   There's a couple of reasons for that, one of them being a

22   document retention policy that is in place for all the analysts

23   at Water Street Capital; the other being just an old --

24        THE COURT:  But do you have any problem with me

25   directing you to have someone with technological expertise look

1    for relevant documents in their phones?

2            MR. RIVERA:  No, Your Honor.  We could do that.

3            THE COURT:  All right.  Why don't you go ahead and do

4    that to assuage Ms. Purdy's concerns that there might be stuff

5    on there that hasn't been produced and that might disappear if

6    we don't do this soon.

7            Within the next two weeks also?

8            MR. RIVERA:  Yes, Your Honor.

9            And so just to make sure we're clear, could that be

10   done through an E-discovery vendor that's --

11           THE COURT:  Fine.

12           MR. RIVERA:  Okay.  And then we would do a relativity

13   search of what's --

14           THE COURT:  Fine.

15           MR. RIVERA:  -- collected.

16           THE COURT:  Ms. Purdy, does that help a little bit?

17           MS. PURDY:  Yes, Judge Barksdale.

18           And part of why I raised this, too, is because we

19   produced the iMessage that's between Mr. Berg and Mr. Enquist.

20   That's not a Signal message.  So the idea that they don't

21   communicate at all via Signal message -- or via text message,

22   excuse me, or iMessage, we know that's not necessarily correct.

23           So I appreciate this procedure for at least checking

24   to see if -- you know, it's -- we're now looking at May 2024 to

25   look and see if there's any relevant communications still on

1   the phone, so yes.

2           THE COURT:  All right.  Anything else?

3           MR. RIVERA:  Not for the defendant, Your Honor.

4           THE COURT:  Anything else, Ms. Purdy?

5           MS. PURDY:  No, Judge Barksdale.

6           THE COURT:  All right.  Thank you.  Appreciate your

7   time today.

8           MS. PURDY:  Thank you, Your Honor.

9           THE COURT:  Court's in recess.

10         COURT SECURITY OFFICER:  All rise.

11      (Proceedings concluded at 11:24 a.m.)

12                   -     -     -

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2    UNITED STATES DISTRICT COURT)

 3    MIDDLE DISTRICT OF FLORIDA )

 4

 5         I, court approved transcriber, certify that the

 6    foregoing is a correct transcript from the official electronic

 7    sound recording of the proceedings in the above-entitled

 8    matter.

 9

10         DATED this 1st of July, 2024.

11

12                        /s/ Katharine M. Healey
                          Katharine M. Healey, RMR, FPR-C
13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```