1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
2                        JACKSONVILLE DIVISION

3   SILVERADO CAPITAL, LLC,          Jacksonville, Florida

4         Plaintiff,                 Case No. 3:23-cv-556-MMH-PDB

5   -vs-                             July 3, 2024

6   WATER STREET CAPITAL, INC.,      10:04 a.m. - 11:10 a.m.

7         Defendant.                 Courtroom 5B
    _____

8

9

10          **DIGITALLY RECORDED TELEPHONE CONFERENCE**
          BEFORE THE HONORABLE PATRICIA D. BARKSDALE
11               UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20  OFFICIAL COURT REPORTER:

21    Katharine M. Healey, RMR, CRR, FPR-C
      PO Box 56814
22    Jacksonville, FL  32241
      (904) 301-6843
23    katharinehealey@gmail.com

24

25              (Proceedings recorded by electronic sound recording;
                      transcript produced by computer.)

1                          A P P E A R A N C E S

2    COUNSEL FOR PLAINTIFF:

3    **LAUREN V. PURDY, ESQUIRE**
     **DAVID M. WELLS, ESQUIRE**
4    **JUSTIN DELISE, ESQUIRE**
     Gunster, Yoakley & Stewart, P.A.
5    One Independent Drive, Suite 2300
     Jacksonville, FL 32202
6    (904) 350-7167
     lpurdy@gunster.com
7    dwells@gunster.com
     jdelise@gunster.com
8

9
     COUNSEL FOR DEFENDANT:
10
     **RICHARD D. RIVERA, ESQUIRE**
11   **STEVEN E. BRUST, ESQUIRE**
     Smith, Gambrell & Russell, LLP
12   50 North Laura Street, Suite 2600
     Jacksonville, FL 32202
13   (904) 598-6157
     rrivera@sgrlaw.com
14   sbrust@sgrlaw.com

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2    July 3, 2024                                10:04 a.m.

3                          -  -  -

4             THE COURT:  Good morning.  This is Judge Barksdale.

5    We're on the record in *Silverado vs. Water Street*.  It's case

6    3:23-cv-556.  I'm in the courtroom with the courtroom deputy

7    and a law clerk.  I understand we have a number of lawyers on

8    the telephone.  I'll just call out your name and if you'll

9    please let me know if you can hear me and you're there.

10            Ms. Purdy.

11            MS. PURDY:  Good morning, Your Honor.

12            THE COURT:  Mr. Wells.

13            MR. WELLS:  Yes, Your Honor.

14            THE COURT:  Mr. Delise.

15            MR. DELISE:  Good morning, Your Honor.

16            THE COURT:  Mr. Brust.

17            MR. BRUST:  Good morning, Your Honor.

18            THE COURT:  Mr. Rivera.

19            MR. RIVERA:  Yes, good morning, Your Honor.

20            THE COURT:  Did I miss anyone?

21       (No response.)

22            THE COURT:  Okay.  Great.  It sounds like I can hear

23    you fine.  If you are the one speaking, if you wouldn't mind

24    picking up your phone and not using a speakerphone.  It usually

25    helps with clarity.  If you get disconnected, just call

1    chambers.  It's (904) 549-1950.

2              All right.  Let's see.  I received the joint status

3    report.  It looks like at the time it was filed there were

4    still issues the parties couldn't resolve.  In the same report

5    the parties asked for deadlines for an amended scheduling

6    order.  Let's go ahead and do those first because I have some

7    dates from Judge Howard.

8              The requested completion of discovery and filing

9    motions to compel date, October 1st of this year.  That's fine.

10             Dispositive and *Daubert* motion deadline,

11   November 1st, that's fine.

12             Deadline for all other motions, including motions in

13   limine, looks like that would be April 28th of 2025.  And, of

14   course, this will be in writing, but I'll just let you know

15   now.

16             Deadline for filing the joint-filed pretrial

17   statement will be May 12th.

18             Final pretrial conference May 18th at 10 o'clock a.m.

19             And then finally, the trial term would begin the

20   June 2nd, 2025, trial term, in the morning.  Looks like it says

21   8 a.m.

22             MS. PURDY:  Judge Barksdale, this is Lauren Purdy.

23             THE COURT:  Yes.

24             MS. PURDY:  We wanted to raise -- sorry -- one

25   specific point about the proposed schedule that we're now

1    concerned about really needing to get discovery completed, and

2    that is we've been attempting to confer with Water Street for

3    well over a month about deficiencies in their electronic

4    production.

5              We briefed with them that we've received only eight

6    loose documents in total in all of their electronic

7    productions.  Every other document is an attachment to an

8    email.

9              We asked them weeks and weeks ago to tell us what

10   their search parameters were.  It took several weeks to be told

11   that they utilized six words to conduct their searches, to

12   which we immediately proposed additional searches more than two

13   weeks ago.

14             We followed up by email five times, received no

15   response, not even, "We're working on it.  We're running hit

16   reports."

17             We finally, on Monday, July 1st -- we started

18   conferring in May -- were told in generalized terms, "We're

19   concerned about the overbreadth of your terms.  We'll run these

20   four or five terms.  Narrow your other terms."

21             We asked them to confirm that they had run hit

22   reports so we can see at least the unique hits so if we can

23   determine if there's an actual breadth issue, which we

24   certainly would confer with them on.  We asked them to confirm

25   that they would do that.  We haven't received a response to

1    that.

2            Other issues that we've raised, we still don't have

3    responses to whether they're going to review and produce

4    documents from folder structures on Water Street's systems

5    because to this point we see no -- we don't have anything in

6    the production suggesting that's occurred.

7            June 3rd was when we raised, with the Court's

8    assistance, the issue of the production of data from their cell

9    phones.  They've indicated that those have been collected

10    except with the exception of one witness.  Now within a month

11    we don't have any indication that we will start receiving

12    electronic data from the phones.

13            And we really don't want to raise this with the

14    Court.  We really want to just work it out with opposing

15    counsel, but we're concerned that it's been almost five weeks

16    since we've raised this.  We only got the electronic production

17    at the end of April, the collection of what they said was their

18    electronic production.  So we've turned around reviewing the

19    documents and raised this.  We haven't gotten anywhere.

20            And we just don't want to be in a position where

21    90 days from now we still haven't received the things that

22    we're entitled to and answers to questions that we diligently

23    followed up on over and over again for weeks and weeks on end

24    with no response.

25            And so if -- if -- we're happy to keep the time if we

1  can get some assurance that we're going to get what we're

2  entitled to and have responses, cooperative assistance in

3  getting the discovery, because otherwise we think that the

4  timeline is fine.  But I don't want to come back, Judge

5  Barksdale, to you 60 days from now saying, "We need another

6  extension of time because we still don't have any answers on

7  the questions that we have."

8         THE COURT:  Who is responding for Water Street, is it

9  Mr. Brust or Mr. Rivera?

10         MR. RIVERA:  Your Honor, this is Mr. Rivera.  I will

11  respond on behalf of Water Street.  Hopefully Mr. Brust doesn't

12  hold it against me.

13         To address I guess the final question that Ms. Purdy

14  asked, Water Street has never said that they will not receive

15  what they're entitled to.  We are working through to try to

16  limit the breadth of these ESI searches to what they are

17  entitled to.

18         One of the concerns that we have -- and obviously

19  this isn't in a motion to compel and hasn't been briefed and I

20  honestly wasn't expecting it to be raised before Your Honor

21  today -- is that there are very targeted requests for

22  production requesting documents relating to these securities

23  that are at issue and communications between Water Street and

24  Mr. Enquist.

25         We determined -- we came up with very -- well, search

1   terms that we believed would gather all of those, including

2   search terms that include the name "Enquist," "Silverado," the

3   names of the companies, the ticker symbols.

4          And in any event, one of the concerns that we've

5   raised with the overbreadth is that these search terms are not

6   targeted to the actual request for production at issue and are

7   much broader and generalized, with the exception of a few,

8   which is what we've agreed to add in that I do think would be

9   targeted to -- to the issue.

10         As Ms. Purdy said, we didn't respond, so we're happy

11  to work through those, and that's what we are intending to do.

12         Another thing I would raise, Your Honor, just so the

13  timeline is clear, although we held the 26(f) conference back

14  in June, these requests were made on Water Street only in

15  February of this year.  And we are diligently working through

16  the issues, but I didn't want Your Honor to think that we've

17  been holding back, you know, for nearly a year on this.  We've

18  been working through it and trying to make sure that all the

19  parties have what they feel like they need in order to

20  prosecute the matter, (inaudible) the matter.

21         THE COURT:  Ms. Purdy said that she'd asked for hit

22  reports and received no response.  Is she correct?

23         MR. RIVERA:  Your Honor, Ms. Purdy asked for that on

24  Monday.  We have not run those hit reports as of yet.  As Your

25  Honor might imagine, we've been focused on these issues that

1   we're bringing before the Court today.

2          THE COURT:  How long will it take you to provide

3   those?

4          MR. RIVERA:  I expect we may have those in a week.

5          THE COURT:  Why do you think that will take that much

6   time?

7          MR. RIVERA:  Well, Your Honor, it is a -- a short

8   holiday weekend, or holiday week this week, and, you know,

9   trying to keep in mind that our vendors don't work the same

10   hours as we do, I was building in some cushion there, Your

11   Honor.

12          THE COURT:  All right.  Well, let's get that to

13   Ms. Purdy by July 10th.  That's a week from today.  And then

14   once she has that, I think the parties can work a little closer

15   on agreeable search terms.

16          And any of the other discovery issues that

17   Ms. Purdy's talked about, Mr. Rivera, you know, our civil

18   discovery handbook requires lawyers to respond to other lawyers

19   in a timely fashion.  And I don't expect lawyers to respond the

20   same day or while they're on vacation or even on the weekends,

21   but in a work week, responses should be provided in a very

22   timely fashion.  And you really should respond.  It doesn't

23   sound like it's fair for Ms. Purdy to have to make a request

24   five different times and continue to not receive a response.

25   So if that continues to happen we'll have to do something about

```
 1    it.  For now, I'll just remind you to provide timely responses
 2    to opposing counsel.
 3              As far as the schedule --
 4              MR. RIVERA:  Thank you, Your Honor.
 5              THE COURT:  -- we're going to keep it as requested by
 6    the parties.  Ms. Purdy, you can document any frustration or
 7    efforts with obtaining discovery and request additional
 8    extensions if it comes to that.
 9              The parties have requested a mid-May trial term.
10    Trial terms don't start in the middle of a month and that's why
11    it was scheduled for June 2nd instead of mid May.
12              MR. RIVERA:  Thank you, Your Honor.
13              MS. PURDY:  Thank you.
14              THE COURT:  Okay.  You're welcome.
15              Let's go to the issue -- the main issue that brought
16    us here today, the two issues stated in the joint status report
17    is, one, whether the defendant's expert may take possession of
18    the image to conduct the examination himself or whether a
19    neutral third party has to do that; and then finally, the scope
20    of the examination.
21              Are both issues still pending, Ms. Purdy?
22              MS. PURDY:  Yes, Your Honor.
23              THE COURT:  Okay.  You want to start with the first
24    one or the second one?
25              MS. PURDY:  I think why don't I start with the
```

1  third-party examiner issue, Judge Barksdale.  And I think it's

2  helpful to start by talking about why we're where we're at with

3  this hearing today.

4         The Court asked us to confer about the protocol and

5  who would conduct the examination.  That was on June 3rd.  We

6  heard nothing from Water Street until June 10th.

7         In the intervening time we sent them the file type

8  report that they actually referenced wanting during the

9  hearing, gave it to them on June 6th, said, "We haven't heard

10 from you, but why don't you review this.  Tell us if there's

11 anything that you know that you want, even apart from a

12 protocol.  We might be able to just facilitate getting you some

13 of these pieces of information while we work through other

14 components of this."

15        We didn't hear anything on the 6th or the 7th or the

16 8th or the 9th, so we followed up on the 10th.  They indicated

17 they were reviewing it and they would get back to us.

18        Later that day they told us, "Give us the forensic

19 image and we'll run the same report."  We responded that night

20 and said, "We're not sure why our" -- "why we can't provide you

21 with the report.  We have no reason to think it's not

22 sufficient.  But if the issue is us controlling the process,

23 which to be clear, we think under the case law and the rules we

24 still could control the process, what about using a third-party

25 examiner?"

1    That's provided in the Sedona Conference principles.
2  That's reflected in the case law.

3    We didn't receive a response.  We followed up on
4  Tuesday.

5    On Wednesday, when I was traveling to the West Coast
6  for a conference, I received an email at 11 a.m. asking me to
7  talk later that afternoon, which unfortunately was not workable
8  with my travel schedule.

9    So we finally talked on the Thursday, so right before
10  the original two-week deadline, and had a discussion at that
11  time.  On -- sorry, on Wednesday counsel for Water Street also
12  suggested that the call with the experts that the Court had
13  suggested and we had suggested would be helpful and they agreed
14  would be helpful, that that call would happen on Friday, before
15  the two-week deadline.

16    So we conferred on Thursday.  We asked them until we
17  were blue in the face to explain from a technical perspective
18  why a third party couldn't be used.

19    We asked them again, "Do you know if there's anything
20  that you know that you want that we might be able to give you?"
21  We even suggested some things that we assumed they might want.
22  They wouldn't tell us.

23    We said we would adjourn and discuss it the next day
24  after the call with the experts.

25    That night we asked them for the calendar information

1   for the dial-in.  We didn't receive a response.

2            On Friday we emailed them twice and we called their

3   office.  We received no response.

4            15 minutes after the time of the call we were

5   supposed to have we received an email saying, "We don't think

6   the experts need to confer until you give us the forensic

7   image," reiterating they just wanted to utilize the protocol

8   that they had previously circulated.

9            They asked if we would talk at 11 a.m. on Monday.  We

10  responded and said, "You haven't conferred.  We still need to

11  confer on this process, but we'll talk to you at 11 on Monday."

12           We didn't receive the dial-in information on Friday

13  or Saturday or Sunday or on Monday.  11 a.m. came and went.

14  Eventually, about an hour and a half after the call, we

15  received an email saying "hearing ran over."  And we finally

16  talked at the end of the day on Monday, which was the original

17  deadline, which is why we asked for an additional week to

18  confer.

19           The parties talked about the potential of still

20  getting the experts on the line, although Mr. Rivera didn't

21  make any assurances that that would happen.  We still followed

22  up with them on Wednesday, having not heard anything.  And we

23  finally had a short call on Thursday and a little bit more

24  lengthy call on Friday, where we again asked repeatedly what it

25  is that they want, how they would propose to search it and,

most importantly, why the third-party process that is utilized
over and over and over again in all the case law not only in
Florida courts but around the country, why that process will
not work here, what it is about what they need to look at or
review that a third party can't facilitate.  And we did not
receive any explanation.  Water Street just reiterated,
"Because your expert received the forensic image from which he
extracted the images, we should receive the image, the forensic
image."  And so we didn't really get anywhere, which is why
both issues are still open.

     From a substantive perspective, Judge Barksdale, the
protocol that they're suggesting that their expert utilize is
that he takes possession of the forensic image himself, he run
what they call a generalized forensic inspection over the
entire phone.

     Again, they won't tell us what they want to look for
or how they want to look for it or what they need, so we are
left to guess.  And from our understanding on our side from our
vendors and who we've consulted with, that means look at
everything for anything that you might want, and then after
their expert has looked at it he will tell us of what he's
looked at what he wants to get his client.

     So there's absolutely no process or procedure for
preventing the review of privileged information, sensitive
information, irrelevant information, because the expert's going

1    to conduct an unknown generalized inspection supposedly

2    targeted at anything related to whether something's been

3    deleted on the phone or otherwise.

4            We've suggested repeatedly -- we've sent them the

5    cases that they cited in their own motion to compel where a

6    third-party examiner was used and asked why this process

7    wouldn't work.

8            We've sent them the resumes of two third-party

9    neutrals that have come highly recommended who are not current

10   Gunster experts to try to find someone as qualified that's

11   separated from our firm as possible.  We didn't receive any

12   comments back about why those individuals cannot be utilized

13   for the process.

14           And that's where we are.

15           We understand that, you know, the rules permit them

16   to have relevant discovery to go to the issue of whether these

17   specific screenshots are authentic.  And we're not trying to

18   stand in the way of them receiving relevant discoverable

19   information that could go to that issue.  But Rule 34 advisory

20   comments note that it doesn't -- just because there's access to

21   electronically stored information, that doesn't mean there's a

22   routine right of direct access.  And the Court needs to guard

23   against undue intrusiveness of the parties's systems.

24           The discovery handbook, which I know, Judge

25   Barksdale, I don't need to quote back to you, but it also talks

1    about protections for a privacy interest, protections for

2    privileged information, which is also a really critical issue

3    in this case, and a process that separates out non-relevant

4    information.  The Sedona Conference Principle 6 reiterates this

5    as well, as we've pointed out and reiterated to counsel for

6    Water Street, and as the Middle District of Florida's cases

7    talks about.

8            We think that, to take a step back, it's really their

9    burden to show that there's something discoverable that they

10   want on that phone that we are refusing to give them or that we

11   are unable to give them because of a lack of expertise.  They

12   haven't even suggested that.

13           We've asked them until we're blue in the face to tell

14   us something that they want, and they won't tell us.  And so

15   that's a significant issue, we think, in this case.

16           The *Wynmoor* case, the *Measured Wealth* case, and the

17   *Benzion* case all cited in their motion to compel recognize that

18   even when there's been an issue with spoliated evidence or

19   exceptional circumstances, it still makes sense to use a

20   third-party neutral examiner as that buffer prevents the

21   opposing party and their experts from having access to

22   information that they're not entitled to review, they're not

23   entitled to have.

24           And so we -- we think that the classic procedure

25   that's always used is the one that should be used here.

1      The *Health Plan Services* case from the Middle

2  District of Florida in 2019 lays this out pretty nicely.  The

3  parties agree on an examiner.  If we can't, then the Court

4  decides.  Water Street proposes search parameters, which we

5  would have the right to review and comment on.

6      The examiner runs the searches.  He provides -- he or

7  she provides to Silverado the results of the searches.  We

8  review and identify the information we don't think should be

9  produced.  And the remaining information is turned over.

10      Mr. Enquist's phone has his entire life on it.  We

11  just did a quick search.  There's thousands of passwords.

12  There's medical information.  As we've said before, he's a

13  federal whistleblower.  He has communications with his lawyers

14  with respect to other matters, with respect to the federal

15  government.

16      It's really incredibly not only invasive from a

17  privacy standpoint, but also potentially careless in terms of

18  privilege and other issues in that case.  And a third-party

19  process would best balance their need for information we

20  concede they should have with -- while protecting Mr. Enquist.

21      And the last thing I would say, Judge Barksdale, is

22  in connection with the limited negotiations we've had with

23  respect to their production of text messages from their own

24  witnesses's phones, counsel for Water Street raised a concern

25  that if we didn't sufficiently narrow the terms for their own

1   review of their own clients's phones, they would be invading

2   their own clients's privacy, because Mr. Berg, Davis Berg, and

3   Mr. Gilchrist Berg, are father and son.

4          And so we're somewhat at a loss of how there's a

5   disconnect between the significant privacy and confidentiality

6   and privilege issues for Mr. Enquist, for their having

7   wholesale access to the forensic image in his phone, while at

8   the same time they're raising concerns about how they may

9   invade their own clients's privacy in reviewing text messages

10  that could be relevant in this case.

11         And so, again, I would just say that the case law

12  supports that this is really the standard process, if you even

13  get to this point, for the examination.  We still think that

14  there's no reason why we can't run the searches and provide

15  them with the information.  They haven't alleged that we

16  wouldn't be able to do that.  But if the Court's inclined to

17  take that process out of our hands, there's no reason, and

18  they've provided no reason, for why a third party can't do it.

19         We went back and looked at the transcript from the

20  last hearing.  The only point that they raised when you asked a

21  question about using a third party, Judge Barksdale, was that

22  it would take too much time.  And I would suggest the hearing

23  was on June 3rd and we've been asking them since June 6th what

24  they want us to give them and they won't tell us.  So I'm not

25  sure that a complaint that it would take too much time in this

1    context holds a lot of water.

2           But that's basically our position on utilizing a

3    third-party examiner.

4           THE COURT:  Mr. Rivera.

5           MR. RIVERA:  Yes.  May it please the Court.

6           Your Honor, I'd like to talk about the substance of

7    what we're talking about here and why a third party is

8    inadequate and why the Sedona Conference and its protocol

9    doesn't -- doesn't apply here.

10          Frankly, the Sedona Conference is meant to put the

11   parties on an equal footing, their experts on an equal footing,

12   where a third party is involved to take possession of or to

13   create a forensic image and then take possession of it to then

14   create a set of documents or a -- files that are then produced

15   to both sides and that the parties are on an equal footing to

16   review the same set of documents.

17          What we have here is where the plaintiffs have

18   created a forensic image, they've provided the forensic image

19   to the plaintiff's expert, who then specifically says in his

20   report that he relied and analyzed the forensic image.  And

21   I'll actually read the language that -- that the expert uses

22   here because I just want to be clear that there is no -- no

23   qualification about whether he's actually said that he reviewed

24   the entire image or just particular files of the image.

25          What he says is, "In forming my opinions set forth in

1   this report, I, or staff working at my direction, have reviewed

2   and analyzed the following materials:

3          "Forensic mobile phone collection named" -- and

4   there's a file name -- " of Jeffrey Enquist's Apple iPhone 12

5   Pro" -- with a serial number -- "referred to herein as 'Phone

6   Image' created with Cellebrite mobile forensic tool by

7   eDiscovery vendor Cimplifi, which used Cellebrite to extract

8   screenshots stored on the Apple iPhone Pro at the time of

9   Cimplifi's collection as listed in Exhibit A."

10         So what he's saying is that he's reviewed and

11  analyzed the entire forensic image.  He clarified that

12  Cellebrite did extract the forensic image and that the images

13  reflected in Exhibit A came from that phone.

14         We contrast that with the targeted forensic computer

15  image where it says that, "Specifically, Exhibit A lists the in

16  scope files from the Computer Image."

17         So there he's clarifying, and, as Ms. Purdy

18  testified -- or not testified, but discussed at the last

19  hearing, the laptop image only contained -- was only of those

20  specific files; whereas the forensic image is of the entire

21  thing.

22         If we look at Rule 26(4)(C), it specifically says

23  that there is no protection for materials provided to -- to the

24  expert that identify facts or data that the party's attorney

25  provided and the expert considered in forming the opinion to be

1    expressed.

2           Essentially what we're asking is for our expert to be

3    permitted to be put on the same footing as their expert in

4    coming to conclusions about whether there's any signs of

5    tampering, forgery, or otherwise fraudulently creating these

6    images that have been provided to the Court.

7           Notably, during these meet-and-confer calls, and on

8    multiple of these meet-and-confer calls, Mr. Brust, my

9    co-counsel, asks Ms. Purdy a very specific and discrete

10   question to try to target and limit as to our concerns about

11   using a third party.  And that question was:  When the forensic

12   image was provided to the expert, did Ms. Purdy or her firm

13   say, "Look at these" -- "look at the images that are on Exhibit

14   A," or was the expert permitted to use his discretion to do a

15   review of the forensic image and come to his own conclusions

16   regarding the validity of those?

17          Ms. Purdy refused to answer that question, said that

18   it was work product, did indicate that we could ask the expert

19   that at a deposition, but that she wasn't going to answer that

20   question during our meet-and-confer process.

21          At that point we would not be able to advocate for

22   our clients and say, "Yes, their expert may have been able to

23   do a full forensic review of this image and use his discretion

24   but, you know, we're not going to" -- "we're going to concede

25   that we can't do that."  You know, that's just a -- patently

1  unfair.  It's not -- it's not contemplated by Rule 26.  And

2  frankly, it would be malpractice when we consider the

3  importance of this evidence, Your Honor.

4       I'm not here to reargue the initial motion to compel

5  that Your Honor heard on June 3rd, but I believe Your Honor

6  indicated that this is potentially the most important evidence,

7  or documentary evidence that's going to be presented at the

8  trial and whether that these images of messages are, in fact,

9  authentic and authentically capture the content of the messages

10 that were exchanged between the parties.

11      As Your Honor also indicated during that, these are

12 not one-size-fits-all types of cases.  We need to look at what

13 are the specific issues that have led to the need for the --

14 for the sharing -- in this case sharing, but often it's

15 creation, of a forensic image.  And in fact, in the cases that

16 Ms. Purdy discussed, they all concern the creation of a

17 forensic image where one did not previously exist.  That's why

18 they talk a lot about the cost and the burden of creating one.

19 And that's why they use a third party, because there was not

20 previously a forensic image that was provided to one party's

21 expert and one party's expert had the opportunity to review and

22 create opinions based on while preventing the other side's

23 expert from doing so.

24      There are out-of-district -- or I did provide one

25 out-of-district case -- or, sorry, out-of-circuit case to

1   Ms. Purdy out of the Northern District of Illinois that

2   required just the creation and provision of a forensic image.

3   And in that case it was a very similar situation where we had a

4   party to a case who used Signal, who had set messages to delete

5   during the pendency of the case and during the time that he

6   knew that litigation was likely, and the Court required that he

7   provide the other party to the case a forensic image of his

8   phone.

9          And here we have a very similar situation where

10  Mr. Enquist not only set these messages to delete from both his

11  phones in -- during the Signal process, or while using Signal,

12  and albeit he set that -- he set that setting, let's just say,

13  months before the actual messages at issue, but he also took

14  screen captures, or purported to have taken screen captures of

15  these messages.  Meaning he had the presence of mind, if we

16  believe his story, to believe that these were going to become

17  important at some time.  And instead of undoing the setting,

18  allowing these messages to persist, or sending these messages

19  via email, via iMessage, where they would still persist, he

20  sent them in the manner in which he knew it would be deleted

21  from the other side while purporting to keep a copy of it for

22  himself, or keep selective copies of it for himself.

23         And so, you know, given the circumstances here and

24  the procedural context of them receiving -- of their expert

25  having received the forensic image, still having the forensic

1   image, you know -- for all we know, if our expert does a report

2   based on the images in the exhibit and he says, "Well, I found

3   evidence that there was manipulation here," for all we know,

4   we're going to receive a rebuttal report from Mr. Weil that

5   says, "No, because there are these three other files that have

6   been in my possession for months and they rebut that there

7   would have been any manipulation here."

8            And as -- without getting into the he-said/she-said,

9   the meet-and-confer process, Your Honor, we did provide the

10  first protocol, at which point Ms. Purdy came back after the

11  hearing to provide her alternate protocol.  We've always had

12  concerns about their expert controlling the process here and --

13  which is why we said we can't just accept the file report run

14  by Mr. Weil, that we -- our expert needs to be able to take

15  possession of the forensic image, use his discretion, and be

16  able to conduct a generalized forensic review.

17           And I know we are purporting to discuss only

18  the our-expert-versus-third-party issue right now, but, Your

19  Honor, I'm happy to go through the scope of what we've proposed

20  to Ms. Purdy and what we proposed to the Court as far as the

21  acceptable scope of how the forensic review would be run.  I

22  believe Ms. Purdy got a little into the scope, but I will hold

23  off in case Your Honor wants to discuss that separately.

24           And so as for whether a third party is acceptable

25  here, Your Honor, we're just trying to get our client and our

1  expert on the same footing as their expert, you know.

2          THE COURT:  Under --

3          MR. RIVERA:  To the extent that they have personal

4  things --

5          THE COURT:  Under your protocol, how -- it sounds

6  like Ms. Purdy's biggest concerns continue to be privileged

7  information and private information.  Under your protocol, how

8  are those things protected?

9          MR. RIVERA:  Yes, Your Honor.  So -- let me pull up

10 the protocol.

11         So first we have a defined scope of the inspection,

12 which is broken out in five subparts.  It states, "The purpose

13 of the inspection shall be for Water Street to obtain

14 information in discovery regarding the following topics or

15 issues:

16         "A, determination of whether the Signal messages and

17 other messages produced in discovery and the associated

18 metadata for those messages are authentic.

19         "B, determination of the original date of creation of

20 the screenshots of the Signal messages produced in discovery.

21         And then, as Your Honor may recall, we had multiple

22 creation dates through the different productions that we

23 received here.

24         Next, "Identification of any system operations,

25 specific commands, or other evidence and processes for events

1   by or during which data has been moved, modified, deleted, or

2   erased from the subject phone, whether through normal operation

3   or otherwise, that may explain or affect the presence or

4   absence of the information falling within the designated scope

5   of inspection.

6           "D, confirmation that there have been no deliberate

7   attempts to compromise the integrity of the information on the

8   phone.

9           "E, identification of any data, including the

10  screenshots of the Signal messages, which was transferred from

11  Mr. Enquist's phone to a computer system and vice versa and the

12  date of said transfers."

13          Then we have a separate provision that talks about

14  the process and the restrictions on the disclosure by our

15  expert.

16          So A is "once the forensic image of the phone is

17  received, the expert will complete the generalized forensic

18  review targeted to the scope of inspection.

19          "B, once the expert completes its generalized

20  forensic review of the phone, the expert shall provide counsel

21  for plaintiff" -- that is, Silverado -- "with a deliverable

22  containing all information obtained by the expert that appears

23  to be responsive to the scope of inspection set out above."

24          There's a little discussion of the format of that

25  deliverable.

1    "C, within ten days after counsel's receipt of this

2    deliverable, Silverado's counsel shall give written notice to

3    counsel for Water Street and to the expert of all items or

4    information that Silverado objects to the expert producing to

5    Water Street.  The objections shall be limited to the following

6    grounds:

7         "Attorney/client privilege, work product protection,

8    or that it's not within the designated scope of inspection.

9    Any such objections must identify specific documents or

10   categories of information for which the protection is sought.

11   It must state specifically for each document the foundation for

12   the claim of privilege or protection."  And that "the failure

13   to object within ten days would be deemed a waiver of the

14   privilege."

15        Then, "The expert may produce any information within

16   the scope that is not the subject of an objection to Water

17   Street after the ten-day period."

18        And then there's provisions for resolving objections

19   and specifically states that "the expert shall not produce or

20   disclose any information that is subject to:  1, Silverado's

21   objections, until such time as the objections are removed by

22   agreement of the parties or by a court order."

23        Now, the other thing that I would say, Your Honor, is

24   as a forensic image was produced to their expert, what

25   protections did they install when they produced the image to

1    their expert for these same things, for these pictures that --

2    of their -- of his private life or of these communications?

3            You know, from our understanding, everything was

4    produced to the expert in this forensic image, and their expert

5    had the ability to look at these things.  Now, whether their

6    expert did or did not, one, we don't know, but presumably he

7    didn't because it wouldn't be relevant to the issues in this

8    case.

9            And I would also add, Your Honor, this protocol that

10   we've provided would also be signed by the experts --

11           THE COURT:  Okay.

12           MR. RIVERA:  -- to ensure that there's no question

13   that the expert is bound by it.

14           THE COURT:  Would you like the relief that you're

15   asking for right now or the ability to cross-examine the iPhone

16   owner about his refusal to provide your expert a full image?

17           MR. RIVERA:  I'm sorry, Your Honor.  Just to clarify,

18   you're asking whether we want the forensic image that we're

19   asking for --

20           THE COURT:  Uh-hmm.

21           MR. RIVERA:  --  or whether we want the ability to

22   cross-examine, presumably at trial, Mr. Enquist for his reasons

23   as to why he did not want to provide us the complete image?  Am

24   I understanding Your Honor correctly?

25           THE COURT:  Correct.  Cross-examining him about a

1    refusal to provide the complete image.

2             MR. RIVERA:  Your Honor, we want the -- we want the

3    relief that we're requesting today.  Unfortunately, if there is

4    something there, we need more than just for him to look poor in

5    front of the factfinder about his unwillingness to produce the

6    forensic image.  We need the actual evidence to present in

7    front of the Court.

8             THE COURT:  Okay.

9             Ms. Purdy, do you want to address the scope issue?

10            MS. PURDY:  Okay.  Yes.  If I could just briefly,

11   before talking about the scope issue, Judge Barksdale, I just

12   wanted to make a couple corrections to some statements that

13   Mr. Rivera made.

14            First of all, he read from the expert report, but

15   what he's stating is not correct about what Mr. Weil did.  What

16   he is indicating, and as we've told them on our

17   meet-and-confers, and as I believe we've also told them in

18   writing, is what he's stating in his expert report is he

19   received the forensic image and from that they extracted the

20   Signal message screenshots on which he relied for his report.

21            We provided a -- we did a full forensic image of

22   Mr. Enquist's phone to -- went, frankly, above and beyond our

23   discovery obligations to preserve relevant data in this case.

24   But the fact that we did an entire forensic collection of his

25   phone, imaging of his phone, and then the expert utilized that

1    image from which to extract the messages on which he relied is

2    not the same thing as the statement Mr. Rivera made that he

3    generally reviewed the entire forensic image before deciding

4    what he wanted to utilize.

5         In his report, the reference to the targeted forensic

6    collection in the laptop is because balancing costs and burden

7    and necessary discovery, we chose to do forensic collections

8    from a laptop rather than completely imaging Mr. Enquist's

9    entire laptop.  So what was provided was from a targeted

10   collection of screenshots on the laptop.  So it's a --

11   completely different.  And the suggestion that he received the

12   image and did a generalized forensic review and therefore they

13   should get to do a generalized forensic review is just not

14   correct.

15        Additionally, counsel asked to -- for me to tell them

16   what our expert did to prepare his report.  We didn't refuse to

17   answer.  I articulated what's within the scope of the rule,

18   which is he's identified for you what he's reviewed and relied

19   on in forming his opinions.

20        We think it's notable that part of why they refuse to

21   let our -- us speak with their expert or have the experts on

22   the phone with the lawyers is because they don't want their

23   expert to articulate what he wants to do to review the forensic

24   image of the phone.  And so we think that that's also a notable

25   difference.

1       Cellebrite is a tool that was used to extract the

2  specific screenshots that were relied on.  I'm not sure if

3  there's a disconnect about what Cellebrite is.  It's simply a

4  tool that was used by our expert to extract the images on which

5  he relied for his report.  I just wanted to make that clear.

6       Another point that I feel that I need to make clear

7  is, again, the parties mutually agreed to use the auto delete

8  for Signal messages.  And one point that we just learned on

9  Monday in this case is that Water Street has utilized a system

10  called Global Relay Archive that is meant to archive all of

11  their electronic communications, which they say it's set up for

12  email and Outlook and Teams, but we can't get them to confirm

13  whether that system, which should and does regularly connect to

14  the cell phones to preserve communications in compliance with

15  FCC regulations, was actually set up here.  And if it would

16  have been set up, there's a tool that goes with Global Relay

17  Archive that actually preserves Signal messages as well.  And

18  they have already indicated to us that they have no copies of

19  any Signal messages either on Mr. Berg's phone or otherwise in

20  the archives.

21       So the -- if there's a suggestion that we've

22  spoliated evidence or there's evidence that's missing, one, the

23  party that should have the Signal messages for regulatory

24  reasons and otherwise is David Berg from Water Street, but two,

25  the issue in this case is really whether there's any evidence

1   of spoliation or manipulation of the screenshots themselves

2   that the parties have.

3          We've given them the screenshots.  And at that same

4   meet-and-confer before we filed the updated status report,

5   counsel for Water Street admitted to us that their expert has

6   not found any evidence that the screenshots that we have

7   provided to them have any evidence of manipulation or forgery

8   to this point.  Now, we're not disputing that that doesn't mean

9   there's something else they can receive within a reasonable

10  scope of the rules and other appropriate procedures, but it is

11  notable that the images that they've received, they don't see

12  any reason at this point -- any forensic evidence that they're

13  not authentic.  So as far as the scope, we think the scope and

14  who is doing the search are really one and the same, Judge

15  Barksdale.

16         The searches that they have proposed in reality is

17  incredibly broad.  They say -- they say "determine the original

18  creation date of the screenshots produced."  Okay.  Well, how

19  would you go about doing that?  We've given you the original

20  screenshots directly from the image.  We asked -- we gave them

21  the report that tells them any metadata manipulator apps that

22  would be on the phone.  There's none on there.

23         We've said -- they've said, "Well, there might be

24  evidence it's been deleted."  We said, "Okay.  Let's talk about

25  how you would go about looking for evidence that applications

1   have been deleted that might go to your point."  They won't

2   tell us how they would go about doing that.  They just want to

3   be able to do it however they want to with the image taken

4   possession by their expert and then go from there.

5             Additionally, the scope, beyond the screenshots

6   produced, is actually quite broad.  Identification of any

7   system operations or commands or evidence that any data has

8   been moved, deleted, or reassessed.  Confirmation of no

9   deliberate attempts to compromise the integrity of information

10  on the phone.  I don't even know what that means, really.  And

11  identification of any data, including screenshots, that was

12  transferred from a phone to a computer and the dates.  Again,

13  that's an incredibly broad, ambiguous statement.  And that's

14  why we've gone round and round till we were blue in the face to

15  get an understanding of what it is they really need to do so

16  that we can come up with a process.

17            And given the breadth of the scope of what they want

18  to do and the procedure, which is that their expert conducts

19  what they call a generalized forensic examination to look at

20  whatever he wants to look at, and then after he's looked at

21  whatever he wants to look at, he'll tell us what he wants to

22  give to his client, is an unprecedented procedure.  We haven't

23  found a single example anywhere in the case law or otherwise

24  reflecting that that procedure is appropriate.  And we --

25            THE COURT:  Well, you probably haven't found an exact

1   case like this either, Ms. Purdy, given the specific

2   allegations --

3        (Simultaneous talking.)

4        THE COURT:  -- hold on a second -- the specific

5   allegations made by your client in the complaint, the specific

6   damages that he's demanding, the specific allegations that are

7   made in affirmative defenses, you have not found a single case

8   like this.

9        And the problem with your argument is that the Court

10  considers the very specific circumstances before it, not

11  looking for cases that might be kind of sort of similar.  It's

12  really going to be fact-dependent.  And so while cases both

13  sides have provided are helpful generally, they're really not

14  going to govern any decision here.

15        MS. PURDY:  I understand, Judge Barksdale.  I guess

16  the point I'm trying to make more generally is that the fact

17  that the procedure that is routinely used, even in instances

18  where there's suspicions that specific evidence has

19  been spoliated --

20        THE COURT:  But I don't even think --

21        MS. PURDY:  -- for which there's --

22        THE COURT:  Ms. Purdy, I don't think you can call any

23  of this routine.  This is a really unusual circumstance, an

24  unusual set of facts.  I'm not sure we can say there's a

25  routine way you address this.  I don't know how you could make

1  that statement, even, without a substantial body of law and

2  practice involving these particular facts.

3         MS. PURDY:  Judge Barksdale, I -- what I mean to

4  say --

5         THE COURT:  Ms. Purdy --

6         MS. PURDY:  -- is that -- I'm sorry, Judge Barksdale,

7  were you trying to say something?  I'm sorry.

8         THE COURT:  No, go ahead.  I'm sorry.  I cut you off.

9         MS. PURDY:  I'm sorry.  It's a little hard on the

10 phone sometimes to not talk over each other.

11        What I'm trying to say is that the third-party

12 process, neutral third-party examiner process, is utilized in a

13 wide range of circumstances for a wide range of reasons,

14 including in circumstances where parties have alleged an

15 intentional destruction of evidence or refusal to provide

16 relevant discovery, including in the circumstances where

17 there's forensic evidence that that has occurred.  And we don't

18 have that in this circumstance.

19        And most importantly, a third-party neutral examiner

20 can conduct all of the same searches that they are talking

21 about, can do the examination that they are talking about, can

22 provide relevant responsive information that they need to be

23 able to confirm whether or not the specifically identified

24 screenshots are, in fact, authentic.  And the fact that we have

25 asked them over and over and over again why a third party

1    cannot be utilized so as to protect Mr. Enquist's -- not only

2    his significant privacy interests, which I don't want to be

3    lost here, but also his, you know, privileged communications

4    and work product and proprietary information, medical

5    information, a whole host of information from being reviewed

6    and disclosed to our opposing side's own expert witness, the

7    fact that they won't tell us what it is he needs to do that

8    can't be done from a mutually-agreed third party or one

9    appointed by the Court is, we think, a significant and really

10   decisive point.

11          If -- and these -- in any circumstance where

12   there's -- you know, in general where there is an allegation of

13   spoliation, manipulation, in whatever its form, third parties

14   are the parties that are utilized to provide that information.

15          And we are not trying to resist the legitimate

16   discovery and production of information that their expert feels

17   he needs to corroborate whether or not the specifically

18   identified screenshots are, in fact, authentic.  We're trying

19   to utilize the procedure and a process that facilitates them

20   getting fulsome disclosure and production of information that

21   they want and would be entitled to while at the same time

22   protecting Mr. Enquist from an undue invasion of not only his

23   privacy but his privilege and work product and proprietary

24   information --

25          THE COURT:  Well, why doesn't --

1          MS. PURDY:  -- by their expert.

2          THE COURT:  Why -- okay.  So now we're repeating a

3    little bit.  So let's cut to the chase.  Why wouldn't the

4    protocol that Mr. Rivera explained before and now on this call,

5    why doesn't that protect your client's privacy interests and

6    privileged and protected information?

7          If the only person who's going to be seeing or using

8    this forensic image is the expert, and before providing

9    anything to Water Street or its counsel you get to review it

10   for privacy or privilege or what have you, why doesn't that

11   work?

12         MS. PURDY:  Because, Judge Barksdale, their expert

13   will have had direct access and review of all that information.

14   Once the cat's out of the bag and their expert gets it and he

15   reviews it and he sees it and he has it and then he's making

16   his own judgments about, among everything he's already looked

17   at, what he also wants to give his client, there's -- and --

18         THE COURT:  He's not going to give his client

19   anything until you've reviewed it.

20         MS. PURDY:  Yes, but, Judge Barksdale --

21         THE COURT:  No, Ms. Purdy, if it's only him -- I

22   think it's a him.  If he's the only one seeing it, and what he

23   pulls from there he's giving to you first before he gives it to

24   Water Street, what do you mean "the cat's out of the bag"?  Are

25   you afraid he's going to see other evidence outside the scope,

1    have that, and use it in some untoward way?

2         MS. PURDY:  Judge Barksdale, I think the way that I

3    would articulate it is twofold.  One, once an expert sees a

4    privileged communication between counsel for Water Street, once

5    he sees something that's outside the scope, once he reviews

6    something that's outside the scope, he knows it.

7         And the idea that if he receives that communication

8    and he reviews it, that we should be okay with the concept that

9    he knows it and he has it, and if he just promises not to tell

10   the people who have retained him in connection with the

11   litigation, is an incredible risk to our client's right to not

12   only privacy, but privilege.  It potentially waives privilege

13   with respect to other lawsuits and litigation and

14   communications with other counsel that Mr. Enquist has, which

15   is totally inappropriate.

16        But two, I guess the other way I would articulate it

17   is when parties have disputes about whether or not, for

18   example, fulsome email communications have been produced and

19   they suspect that something hasn't been produced that should

20   have been, parties don't get to go and say, "Well, give me the

21   entire PSP to give to our expert and he'll look through it

22   himself and run additional searches himself and figure out if

23   there's anything else missing that he wants, and he just won't

24   tell us if he finds something that's outside the scope of what

25   he was looking for."

1        And so the concept that if their expert just promises

2   not to tell them, that that is sufficient protection for our

3   client and all of the interests that we've talked about is just

4   simply not workable.

5        And we've asked them, "Is there something about what

6   you need to run that can't be run by a third party," so that we

7   can understand that if there's something about that process

8   that prevents them from being on equal footing while also

9   protecting our client's privacy and privilege and

10  confidentiality, and they can't tell us or they won't tell us.

11  And we think it's because the process would work.  And there's

12  no reason that they've ever given us that it won't work.

13       And I understand, Judge Barksdale, that every case is

14  different and the factual circumstances are different, and

15  that's why we always default to the rules and the comments to

16  the rules and the general principles.  And that makes sense,

17  because you can -- you know, every case has its own

18  distinction.  But I'm not aware of a single case where an

19  expert has been provided an image to review and then simply

20  promises not to turn over something that's privileged or

21  otherwise and disclose it to their own client who they have

22  been retained by in connection with the litigation.  And that's

23  why the third-party process is utilized and that's why it

24  works.

25       THE COURT:  Okay.  Well, we're going --

1        MS PURDY:  That's why we --

2        THE COURT:  -- to repeat ourselves, so I'll cut you

3    off given the interest of time.

4        Mr. Rivera, Ms. Purdy's been talking for a bit about

5    scope but then we shifted back to third party.  Would you like

6    to address any of that?

7        MR. RIVERA:  Yes, briefly, Your Honor.

8        Ms. Purdy said she was correcting some inaccuracies,

9    specifically when I read -- read the quote from Mr. Weil's

10   report.  I just want to be clear that I didn't say that he

11   generally -- well, I didn't say that he generally reviewed the

12   phone.  That's what the -- or the forensic image.  That's what

13   the report says.

14       And specifically, when we asked Ms. Purdy whether,

15   you know, he was instructed to limit it -- limit his review to

16   certain files or whether he was able to use his discretion, his

17   expertise to run a fuller analysis, that was what Ms. Purdy

18   said that she was not going to answer for us and that we could

19   ask her expert about it in deposition.

20       You know, and I think still throughout this, you

21   know, Ms. Purdy still hasn't fully answered that question for

22   the Court and hasn't told Your Honor whether their expert was

23   constrained to the specific files that he discusses in his

24   report or whether he was able to use his discretion and also

25   conduct a generalized forensic review but then limited his

1    opinions to facts based on certain files.

2         THE COURT:  How -- you were -- you were -- your

3    volume was decreasing there at the end.  I didn't hear your

4    last sentence.

5         MR. RIVERA:  Oh, I'm sorry, Your Honor.  Just that,

6    you know, she hasn't even said -- Ms. Purdy hasn't said today

7    whether their expert was directed to look at the certain images

8    that are referenced in his report or whether he was allowed

9    himself to use his discretion, conduct a generalized forensic

10   review of the forensic image but then limited his report to the

11   facts contained in the images that are listed in his report,

12   perhaps because those were the things that supported their

13   version of the story while other files and facts based on those

14   files would not have supported their version.

15        THE COURT:  Have the parties talked about not

16   using -- Silverado not being able to use its expert at all and

17   instead coming together to have a joint expert report on these

18   messages, any deletions, et cetera, et cetera?

19        MR. RIVERA:  No, Your Honor, the parties have not

20   discussed that.

21        THE COURT:  And your thoughts on that?  So your

22   biggest issue is your expert -- what's good for their expert is

23   good for your expert.  You want the same thing they had.  If

24   both sides agree to just use a neutral third party for the

25   forensic examination of this phone, would that satisfy your

1    concern?

2              MR. RIVERA:  Well, Your Honor, first, I would say

3    that Your Honor did ask opposing counsel whether they intended

4    to offer Mr. Weil at trial and they said that yes.  And, you

5    know, I believe that they do for the same reason that we want

6    to offer our own forensic expert at trial, because we want

7    somebody --

8              THE COURT:  Well, let's say they agree not to

9    offer -- if the Court says you can't use your expert but you

10   can -- both sides can pick an expert and use a neutral one

11   under the circumstances, would you be okay with that?

12             MR. RIVERA:  Yes, Your Honor, we would agree to that.

13             THE COURT:  Ms. Purdy, would you?

14             MS. PURDY:  Judge Barksdale, potentially I think we'd

15   want to talk to our client before committing to switching

16   horses, but potentially.

17             THE COURT:  Because if Mr. -- Mr. Rivera's biggest

18   concern, as I said, is your expert had a forensic image to use

19   and had certain instructions on what to do, and their expert

20   wouldn't have the same freedom.  It sounds like that's his

21   concern.  Whether it's valid or not, that's his concern.

22             But if you have an expert perhaps even chosen by the

23   Court to examine this phone for, well, what's in the scope of

24   what Mr. Rivera read, possibly limited but common sense tells

25   you exactly what they're looking for in that scope, and having

1  a single expert who is associated with neither side doing this

2  work, it might be the way to resolve everybody's concern.  They

3  get the discovery they want, you get your privacy/privilege

4  protections.

5          It's -- as I say it, it's unusual because it's an

6  adversarial process.  And we would typically see competing

7  expert witnesses on this issue.  But it's a spoliation issue.

8  It might be that it's not an appropriate place or adversarial

9  expert witnesses, it's simply a place for an expert witness.

10          MS. PURDY:  Judge Barksdale --

11          THE COURT:  Ms. Purdy, have you seen this done in any

12  of the cases that you've looked at?

13          MS. PURDY:  I'm not sure, to be fully candid, Judge

14  Barksdale, if I've seen something this specifically on point to

15  your earlier comment when I was speaking before, but I do think

16  it's a potential solution.  Like I said --

17          THE COURT:  I mean, it's in the ilk, too, of a

18  special master, right?

19          MS. PURDY:  Yep, exactly.  Yes, it is --

20          MR. RIVERA:  Yes, Your Honor.

21          MS. PURDY:  -- it is similar to a special master,

22  which -- so I -- I think we would be potentially amenable to

23  that as a solution to this -- to this problem.

24          MR. RIVERA:  Your Honor, for Water Street, I agree

25  with your statement regarding just having a neutral expert on

1   the spoliation issue does make sense for Water Street.  We're

2   just trying to find the truth here.

3          THE COURT:  All right.  Well, Ms. Purdy wants to talk

4   to her client on this possible solution.  I mean, frankly, the

5   lawyers on both sides are making valid points; they're making

6   good points.  It's a difficult issue.  It is unlike the cases

7   that I've looked at.

8          If the parties can get -- you know, talk to their

9   clients and get together on a single expert witness within the

10  scope -- I mean, what -- Mr. Rivera's scope sounded fine.  It

11  didn't sound broad when you use common sense.  But if you work

12  from there and identify some expert who can do this report, I

13  think that might be the best solution.

14         I know Ms. Purdy has indicated we're running out of

15  time because the new discovery deadline will be here before we

16  know it, so I'm going to set a fairly brief period of time for

17  the parties to discuss this new approach, recognizing that

18  tomorrow's a holiday and a lot of people are off on Friday.

19  Would a deadline of next Friday, which is July 12th, to notify

20  the Court whether the parties have agreed on this neutral

21  expert witness for the spoliation issues work, Ms. Purdy?

22         MS. PURDY:  Yes, that would work for us, Judge

23  Barksdale.

24         THE COURT:  Mr. Rivera?

25         MR. RIVERA:  Yes, Your Honor.

1      THE COURT:  All right.  So let's do that.  Put your

2  heads together and see if this approach will work.  If it

3  doesn't, I -- I understand the parties's arguments.  And if you

4  notify the Court on the 12th one way or the other, I'll simply

5  just have to make a decision based on what the parties have

6  said in the written materials and at our two conferences.

7      And as I said, it's not an easy decision because both

8  sides are making valid points.  But maybe this is a way that we

9  can address everybody's concerns.

10      But thank you for your thoughtful arguments and good

11  presentations and willingness to think outside the box on how

12  to resolve this.

13      Ms. Purdy, is there anything else right now?

14      MS. PURDY:  No, Judge Barksdale.

15      THE COURT:  Would you prefer that I hold off on

16  amending the case management and scheduling order until after

17  we figure out the approach that's going to be taken here?

18      MS. PURDY:  I think, speaking on the Silverado side

19  of the street, that that would make sense, just because we need

20  to exchange a little more information to kind of have a better

21  understanding of the potential for when an expert would be able

22  to get up to speed and review the image and whatnot.  So I

23  think we need to kick it down the road just a little bit from

24  our side.

25      THE COURT:  Okay.  So in the notice on the 12th, why

1    don't you let me know -- either stick with what you've

2    requested in your June 24th filing at document 38, which is the

3    joint status report, or if you think extending those deadlines

4    further is warranted, just say so in the notice.

5              MS. PURDY:  Okay.  Thank you, Judge Barksdale.

6              THE COURT:  Okay.  You're welcome.

7              Mr. Rivera, anything else from your side?

8              MR. RIVERA:  No, Your Honor.  Thank you very much.

9              THE COURT:  Okay.  Again, I appreciate the parties's

10   good arguments.  Happy 4th of July to everyone.

11             MS. PURDY:  Thank you.

12             THE COURT:  Court's in recess.

13             (Proceedings concluded at 11:10 a.m.)

14                         -    -    -

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2     UNITED STATES DISTRICT COURT)

3     MIDDLE DISTRICT OF FLORIDA )

4

5          I, court approved transcriber, certify that the

6     foregoing is a correct transcript from the official electronic

7     sound recording of the proceedings in the above-entitled

8     matter.

9

10         DATED this 10th of July, 2024.

11

12                          /s/ Katharine M. Healey
                            Katharine M. Healey, RMR, FPR-C
13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25